Joseph TEFF, D.C. d/b/a Teff Chiropractic, and Soderholm-Wilder Chiropractic Clinic, S.C., d/b/a Madison Chiropractic-East, Plaintiffs-Respondents-Cross-Appellants,

v.

UNITY HEALTH PLANS INSURANCE CORPORATION d/b/a Unity Health Plans, Defendant-Appellant-Cross-Respondent.

Court of Appeals

No. 02–1319. *Submitted on briefs February 7, 2003.—Decided May 29, 2003.*

2003 WI App 115

(Also reported in 666 N.W.2d 38.)

710

On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the briefs of *Thomas M. Pyper* of *Whyte Hirschboeck Dudek S.C.,* Madison.

On behalf of the plaintiffs-respondents-cross-appellants, the cause was submitted on the briefs of *Mark Frankel* and *James D. Peterson* of *LaFollette Godfrey & Kahn,* Madison, and *Charles W. Giesen* of *Giesen Law Offices, S.C.,* Madison.

Before Vergeront, P.J., Dykman and Lundsten, JJ.

¶ 1. VERGERONT, P.J. This case concerns a dispute over contracts between Unity Health Plans Insurance Corporation, a health maintenance organization, and two providers of chiropractic services: Dr. Joseph Teff and Soderholm-Wilder Chiropractic Clinic. After entering a default judgment against Unity on liability, the trial court held an evidentiary hearing on damages. It awarded $449,447.81 in damages plus prejudgment interest to Teff and $234,306.85 in damages plus prejudgment interest to Soderholm-Wilder. Unity appeals, contending the trial court erred in: (1) entering a default judgment on liability, (2) construing the 1995 contract, (3) not permitting Unity to call expert witnesses, (4) not reducing lost revenues for 1997 by the

711

amount that loss was "mitigated," (5) awarding damages for defamation, and (6) awarding prejudgment interest. We conclude that on the first five points, the trial court did not err. With respect to prejudgment interest, we conclude the court correctly awarded prejudgment interest for the damages for 1995 and for the services performed in the first month of 1997, but that it erred in awarding prejudgment interest on the damages for lost revenues for 1997 because those damages were neither liquid nor liquidable.

¶ 2. Teff and Soderholm-Wilder cross-appeal the trial court's dismissal of their claim for promissory estoppel. We conclude the court correctly ruled that their claim for promissory estoppel was barred because their contract with Unity covered all the essential terms of the business relationship with Unity.

¶ 3. Accordingly, we reverse the judgment insofar as it awards prejudgment interest on lost revenues for 1997, affirm the judgment in all other respects, and remand for a recalculation of prejudgment interest consistent with this decision.

## BACKGROUND

¶ 4. Teff and Soderholm-Wilder entered into a contract with Unity to provide chiropractic services to its members for the year 1995. The contract was renewed for 1996 under the provision for automatic renewal for another year if neither party notified the other of the intent to terminate within 180 days before the expiration of the current term. In December 1996, Unity terminated the contract effective January 1, 1997, although Teff and Soderholm-Wilder provided services to Unity members for a short time thereafter on a fee-for-service basis.

712

¶ 5. Teff and Soderholm-Wilder filed this action alleging various contract claims—that Unity had wrongfully terminated the 1996 contract because it had not given the required notice, had failed to make payments as required under the contracts for 1995 and 1996, and had failed to pay for services provided in January 1997. The complaint also alleged a number of tort claims, some of which were dismissed by partial summary judgment. The contract claims and claims for defamation, interference with prospective business advantage, and promissory estoppel were scheduled for trial beginning on June 25, 2000. The October 18, 1999 scheduling order required Teff and Soderholm-Wilder to name experts and provide reports by December 15, 1999, and Unity to do so by January 31, 2000. The order provided that any witness not disclosed as required by the order would not be permitted to testify at trial except for good cause, and failure to comply with the terms of the order would be cause for imposing sanctions, including dismissal and default judgment.

¶ 6. In November 1999, Teff and Soderholm-Wilder moved to compel discovery on the ground that Unity had provided evasive interrogatory answers and failed to produce requested documents. This followed an earlier motion to compel discovery, after which the court directed the parties to resolve that discovery dispute. The court granted the second motion to compel and ordered Unity to provide the requested discovery by December 20, 1999. In February 2000, Teff and Soderholm-Wilder filed a third motion alleging that the material Unity provided in response to that order was evasive and non-responsive, as were responses to requests for admissions, and that Unity had not permitted review of documents that were relevant to the action. The motion asked as a sanction that the court

strike Unity's answer and counterclaims. In another motion filed at the same time, they requested an order precluding Unity from calling any expert witnesses not disclosed as required by the scheduling order.

¶ 7. After a hearing on these motions on May 1, 2000, the court declined to grant the relief requested by Teff and Soderholm-Wilder, although it stated that it was "this close" to granting the motion and further disobedience of the court's orders would result in stronger sanctions, including default judgment. The court's order issued orally on that date, and later reduced to writing, directed that Unity provide a list of its trial witnesses by May 15, comply with the earlier order compelling discovery by May 31, and pay the movants $3,984.49 no later than May 31. The trial date was adjourned.

¶ 8. On May 19, 2000, Unity filed a notice of appearance of new counsel, an outside law firm, explaining that the in-house counsel who had been representing Unity left the employment of Unity's parent company on May 11, 2000. Shortly thereafter, Teff and Soderholm-Wilder moved for a default judgment because May 15 had passed without Unity providing a witness list. On May 30, Unity's new counsel filed a motion to amend the scheduling order and enlarge the time for discovery and sent a list of potential witnesses to Teff and Soderholm-Wilder. When the May 31 deadline passed without Unity complying with the order compelling discovery or paying the sanction, Teff and Soderholm-Wilder filed a motion for a default judgment on these additional grounds.

¶ 9. The court granted the motions for a default judgment on all the remaining claims, struck Unity's counterclaims, and set an evidentiary hearing on damages. In arriving at this conclusion, the court explained

that it was considering not only the violation of the May 1 order, but the preceding repeated failures to comply with the scheduling order regarding witnesses and the discovery demands. The court commented on what it perceived to be Unity's failure to take the lawsuit seriously and give it the attention it deserved, in spite of having an entire staff of attorneys to attend to its legal needs. The court stated that it did not know what caused the departure of the attorney initially representing Unity, but it concluded that Unity, not the plaintiffs, should bear the burden of Unity's choice to continue to have that attorney represent it even after the numerous violations of discovery and scheduling orders.[1] The court acknowledged that a default judgment was the most stringent of remedies, but concluded that Teff and Soderholm-Wilder were entitled to this remedy.

¶ 10. After a lengthy evidentiary hearing, the court entered a written decision awarding the following damages: unpaid reconciliation payments for 1995—$109,217.13 to Teff and $41,818.37 to Soderholm-Wilder; fees for services provided in January 1997, which were not disputed—$10,595.05 to Teff and $6,130.66 to Soderholm-Wilder; lost revenues for 1997—$319,635.63 to Teff and $176,357.82 to Soderholm-Wilder; and defamation—$10,000 to each. The court concluded that Teff and Soderholm-Wilder had not established that they were entitled to any additional reconciliation payments for 1996, had not established damages for interference with prospective patient relationships independent of damages for breach of con-

---

[1] At the hearing, Unity's new counsel stated that he understood from remaining in-house counsel that the departure was not voluntary, that there had been discussion about finding other employment, but the actual departure was abrupt and unexpected.

715

tract, and, as a matter of law, the promissory estoppel claim was barred because of the existence of the contracts. The court also concluded that Teff and Soderholm-Wilder were entitled to prejudgment interest on all the damages except those for defamation, because with that exception, the damages were "liquid or liquidable."

## DISCUSSION

### Default Judgment

¶ 11. Unity contends that the trial court erroneously exercised its discretion in granting a default judgment because it applied the wrong legal standard in that it did not require that Unity act egregiously or in bad faith, but only that it lack a justifiable excuse. In addition, Unity asserts, the evidence established that it did have a justifiable excuse.

¶ 12. The decisions whether to impose sanctions on a party and which sanctions to impose are committed to the trial court's discretion. *See Schultz v. Sykes*, 2001 WI App 255, ¶ 8, 248 Wis. 2d 746, 638 N.W.2d 604. We affirm discretionary decisions if the court examined the relevant facts, applied the proper legal standard, and reached a reasonable conclusion. *Garfoot v. Fireman's Fund Ins. Co.*, 228 Wis. 2d 707, 717, 599 N.W.2d 411 (Ct. App. 1999). When the issue is whether the court applied the proper legal standard in exercising its discretion, we review that issue de novo. *Sulzer v. Diedrich*, 2002 WI App 278, ¶ 9, 258 Wis. 2d 684, 654 N.W.2d 67.

¶ 13. The parties both agree that a default judgment is an appropriate sanction for discovery violations

if the court finds the noncomplying party's conduct is: (1) without a clear and justifiable excuse, and (2) either egregious or in bad faith. *Hudson Diesel, Inc. v. Kenall,* 194 Wis. 2d 531, 542, 535 N.W.2d 65 (Ct. App. 1995). In support of its argument that the trial court did not apply the second requirement, Unity points to the court's questioning of Teff's and Soderholm-Wilder's attorney after his initial presentation on the motions. The court questioned whether the requirement of egregiousness or bad faith had been met. We do not agree with Unity that this shows the court did not apply this standard; rather, it shows the court understood this was the standard and, at that point in the proceedings, had not come to a decision on whether the standard had been met.

¶ 14. Unity also points out that when the court explained its decision that a default judgment was warranted, it did not use the words "egregious" or "bad faith" to describe Unity's conduct. However, we do not reverse simply because the court did not use these words if there is an implicit finding under the correct standard and if the facts provide a reasonable basis for the court's implicit determination. *Schneller v. St. Mary's Hosp. Med. Ctr,* 162 Wis. 2d 296, 311, 470 N.W.2d 873 (1991). We conclude the facts do provide a reasonable basis for the court's implicit determination that Unity's conduct was egregious. Egregious conduct is conduct that, although unintentional, is "extreme, substantial and persistent." *Kenall,* 194 Wis. 2d at 543. There is a reasonable basis in the record for determining that Unity's conduct met this standard. Not only did Unity disobey the court's order compelling discovery, but its disobedience persisted even after the court warned that further disobedience would result in stron-

ger sanctions than the monetary one it imposed, including a default judgment. In addition, the record, including the affidavits filed by Teff and Soderholm-Wilder, show that Unity's failure to provide discovery did not involve simply a few pieces of information, but was an extensive disregard of Unity's obligations that a reasonable judge could find substantial and extreme.

¶ 15. With respect to the requirement of no justifiable excuse, Unity argues its failure to comply with the May 15 and May 31, 2001 deadlines was excusable because its counsel ceased employment on May 11, and it acted promptly to retain new counsel, who did not receive the written order entered after the May 1 hearing until May 23. New counsel acted reasonably and promptly, Unity contends, in requesting additional time and providing a non-inclusive list of potential witnesses. Unity reasons that, since the court decided that a default judgment was not warranted at the hearing on May 1, and since the noncompliance after that date was due to its counsel leaving, the court acted unreasonably in entering a default judgment. Unity also argues that the court impermissibly imposed a stricter standard for in-house counsel in deciding whether Unity had a justifiable excuse, because it stated that its analysis might be different if Unity's attorney were a solo practitioner.

¶ 16. We do not agree with Unity's analysis for several reasons. First, the court was not precluded from taking into account the entire history of Unity's conduct simply because it had decided on May 1 to give Unity one more chance to comply with its orders. That decision does not necessarily mean that the conduct leading up to that point did not warrant a default judgment; rather, it may simply mean that the court

718

decided not to impose that sanction at that time. Unity, with its new counsel, made no attempt to explain why its prior violations were justifiable. Second, the record supports the court's determination that Unity acted unreasonably in continuing to have the first attorney represent it, and thus was responsible for suddenly having to find new counsel who was not in a position to comply with the May 1 order: there is no evidence that Unity did not know of the violations of the prior orders, and it was reasonable for the court to infer either that Unity did know or should have known. Third, the court did not impose a stricter standard for in-house counsel, but was appropriately taking into account the record before it, from which the court could reasonably infer that Unity had other attorneys available, and thus there was no excuse for not responding to court orders. The reference to a solo practitioner as a different situation did not establish a different standard, but was simply the use of a contrasting example to explain why Unity did not have the excuse of insufficient personnel for its failure to comply with court orders.

¶ 17. We are satisfied that the court applied the correct legal standard, considered the facts of record, and made a reasonable decision to enter a default judgment.

*Contract Construction*

¶ 18. The dispute over whether Teff and Soderholm-Wilder were entitled to additional payments for 1995 was based on the parties' differing interpretations of their contract. An addendum that took effect on March 1, 1995, provided that payment to Teff and Soderholm-Wilder would be on a capitation basis—a fixed sum paid monthly for each member. The addendum explained that the capitation payment was com-

719

puted on a baseline utilization of members seeking chiropractic services, with each chiropractor's capitation payment based on the portion of the number of members the chiropractor had provided services to in the first nine months of 1994. The addendum also provided for a reconciliation if actual utilization differed by more than a specified percentage above or below the baseline utilization. Teff contended before the trial court that under this provision he was owed $109,217.13 in reconciliation payments for 1995, and Soderholm-Wilder contended it was owed $41,818.37.

¶ 19. Unity's position in the trial court and before this court is that the addendum does not set forth the reconciliation procedure that the parties intended. According to Unity, we must consider another document along with the addendum, the Reconciliation Payment Calculation for 1995, which includes an additional step in computing the reconciliation payments. Together these documents create an ambiguity, Unity asserts, which we must resolve by resort to extrinsic evidence. Unity contends that under the procedure the parties intended, Teff and Soderholm-Wilder are not due the sums awarded by the trial court.[2]

¶ 20. The trial court concluded that the terms of the addendum governed, and it awarded the sums requested by Teff and Soderholm-Wilder.

¶ 21. In construing a contract, we begin with the language of the contract, and if that is plain, we enforce those terms as written. *Erickson v. Gundersen*, 183 Wis.

---

[2] In Unity's post-hearing brief in the trial court, it asserted that if the proper reconciliation procedure were applied, the maximum amount owed to Teff would be $22,143, and the maximum amount owed to Soderholm-Wilder would be $12,387.

2d 106, 117, 515 N.W.2d 293 (Ct. App. 1994). It is only when the contract on its face is ambiguous that we may look outside the contract to extrinsic evidence to determine the intent of the parties. *See id.* at 118 n.3. Whether a contract is ambiguous is a question of law, which we review de novo. *Id.* at 115.

¶ 22. As is evident from the mere recitation of these well-established principles, the Reconciliation Payment Calculation may not serve to create an ambiguity in the contract between the parties. That contract is expressed in the addendum, and the language on the method of reconciliation is not ambiguous. The Reconciliation Payment Calculation for 1995 is not part of the addendum but is simply Unity's own calculation of the reconciliation payments. We conclude the trial court correctly decided that the provisions on the reconciliation payments expressed in the addendum governed the computation of reconciliation payments for 1995.

*Expert Witnesses*

¶ 23. During the trial on damages, Teff and Dr. Jeff Wilder testified on the projected lost revenues for 1997 resulting from Unity's termination of the contract effective January 1, 1997. Unity objected to their testimony on this topic on the ground that they were providing expert testimony. They were not qualified to testify as experts, Unity argued, and they had not been identified as expert witnesses. The court allowed Teff and Wilder to testify on matters related to their own businesses, explaining that it did not view this as expert testimony. The court did not allow Unity to present two witnesses—a chiropractor and a financial expert—on the ground that they were not identified as required by the scheduling order, no motion to amend the order had

721

been timely brought, and it was too late in the proceedings to allow witnesses who had not been identified or deposed.

¶ 24. Unity contends that Teff and Wilder did not have the expertise required to testify on projected economic losses, and that the court committed legal error because it applied a different standard to Unity than it did to Teff and Soderholm-Wilder by allowing Teff and Wilder to testify, but not Unity's experts.

■

¶ 25. We begin by examining each of the trial court's decisions on these witnesses separately, and we do so applying a deferential standard of review. The decision whether a witness is competent to testify on a particular matter is within the trial court's discretion, *Love v. State*, 64 Wis. 2d 432, 439, 219 N.W.2d 294 (1974), as is the decision whether to permit a witness to testify who was not identified as required by court order. *Siker v. Siker*, 225 Wis. 2d 522, 535, 593 N.W.2d 830 (Ct. App. 1999).

¶ 26. In order to establish lost revenues for 1997, Teff and Wilder estimated the capitation and reconciliation payments they would have received under the Unity contract for that year. They first calculated the percentage of total Unity chiropractic patients each saw in 1995 based on their own records and information provided by Unity. Teff and Wilder explained the basis for their reasoning that their percentage of Unity's chiropractic patients would have been at least as great in 1997 as in 1995, which included the total number of Unity's chiropractic providers during the relevant period. They also testified that 1995 was a more reliable indicator than 1996 because the number of Unity patients they had in 1996 was adversely affected by certain actions of Unity related to this dispute. To

arrive at their lost 1997 capitation payments, they applied the 1995 percentage to the total capitation payments Unity made to chiropractors in 1997, which information Unity provided in discovery. To arrive at their lost 1997 reconciliation payments, they applied the 1995 percentage to an estimate of the total reconciliation payments Unity made to chiropractors in 1997; the estimate was based on the ratio of 1996 capitation payments to 1996 reconciliation payments, applied to the 1997 capitation payments. They explained that Unity had not provided the actual amount of 1997 reconciliation payments in response to discovery requests.

¶ 27. In deciding to admit this testimony, the court reasoned that, as business owners, Teff and Wilder were competent to testify on the value of their businesses. The court relied on *D'Huyvetter v. A.O. Smith Harvestore*, 164 Wis. 2d 306, 323, 475 N.W.2d 587 (Ct. App. 1991) (general rule in Wisconsin is that nonexpert owners may testify to the value of their property; weight is for the trier of fact). It accepted Teff's and Wilder's testimony, based on their records, of their percentages of all Unity patients for 1995, and it accepted their reasons for their estimation that the percentage in 1997 would have been at least as great, including finding that 1995 was a more reliable indicator than 1996. The court found their estimation of the total 1997 reconciliation payment reasonable because Unity had not timely provided that information in discovery.[3]

---

[3] In contrast, the court found that Teff's and Wilder's testimony estimating lost referrals for 1997 and their extrapolation from that to the value of those lost referrals went beyond

¶ 28. We conclude that the court properly exercised its discretion in allowing Teff and Wilder to testify on the lost capitation and lost reconciliation payments for 1997 and in relying on that testimony. On those points, their testimony was based on detailed records they kept in the course of their business, and on the knowledge and experience they had acquired from running their chiropractic businesses, and that is sufficient. *See Black v. Gen. Elec.*, 89 Wis. 2d 195, 212, 278 N.W.2d 224 (Ct. App. 1979).

¶ 29. We also conclude the court properly exercised its discretion in not allowing Unity's two witnesses to testify. A trial court has broad discretion in deciding how to respond to untimely motions to amend scheduling orders because that broad discretion is essential to the court's ability to manage its calendar. *Schneller*, 162 Wis. 2d at 310. The trial court's decisions to exclude these two witnesses were well within that broad range of authority.

¶ 30. Unity provided a witness list on May 30, 2000, which listed neither as a witness, but did state "Additional Madison-Area Chiropractors—(to be identified)." The evidentiary hearing on damages began on November 15, 2000, and took place over six days between that date and August 21, 2001. On the second last day, June 28, 2001, Unity sought to have the chiropractor testify, although it had not until that time identified him as a witness. Teff and Soderholm-Wilder objected. The only reason Unity gave for not having

their expertise as chiropractors, and therefore it did not award any damages for lost referrals. That finding is not at issue on this appeal.

identified him sooner was that he was a rebuttal witness and it was not possible to fully identify rebuttal witnesses until the plaintiffs' case had been presented. However, it was evident from Unity's description of the chiropractor's proposed testimony that he was not responding to unanticipated testimony. The court reasonably concluded that it would unnecessarily prolong the trial to have the chiropractor testify when he had not been deposed earlier. The court also took into account that his proposed testimony—the nature of his own business practices—would not be useful in determining contract damages for Teff and Soderholm-Wilder. When Unity expressed a desire to call an expert to testify on contract damages, the court made clear that if Unity wanted to do that, it would need to move the court in writing to amend its witness list; the court emphasized that Unity had known what Teff's and Wilder's testimony would be at trial, and there had been adequate opportunity before this point in the trial to identify rebuttal witnesses.

¶ 31. The next day of the hearing—the last day— took place on August 21, 2001. In spite of the court's clear explanation of what Unity needed to do if it wanted to have the court consider its request to call an expert, Unity did not file a motion to amend the witness list and permit it to call an expert until that morning, having faxed a copy to opposing counsel the night before. The court acted reasonably in denying the motion, thoroughly explaining its reasons: Unity had known of the plaintiffs' theory of damages since at least September 2000, and had plenty of time to develop a theory of defense and retain an expert; the evidentiary hearing had begun in November 2000 and already taken five days; Unity had already forfeited time on June 28, 2001, because it did not have witnesses ready

to testify; the court had made clear on that date that a motion would have to be made immediately for the court to even consider a request to call an expert witness; and the witness had not yet been deposed.

¶ 32. There is no merit to Unity's contention that the trial court acted unfairly and committed "legal error" in making these decisions regarding Unity's proposed witnesses while permitting Teff and Wilder to testify. Teff and Wilder were timely disclosed as witnesses, and Mackey and the financial expert were not. The court was consistent in its view that testimony about one's own business was admissible: it permitted employees of Unity to testify on matters of Unity's business of which they had firsthand knowledge, just as it did Teff and Wilder.

*Amount of 1997 Losses*

¶ 33. Unity argued in the trial court, as it does on appeal, that any damages for lost revenues for 1997 must be offset by amounts Teff and Soderholm-Wilder were able to earn that year without Unity patients. Unity relied as evidence for the offset on an exhibit (exhibit 99) showing the gross and net revenues for Teff and Soderholm-Wilder from 1994 through 1998, based on their tax returns, which showed an increase from 1996 to 1997. According to Unity, the amount of offset for Teff can be computed by taking the percentage of increase in gross revenues from 1995 to 1996, which was 17%, assuming the same percentage of increase from 1996 to 1997, and subtracting from the resulting projected figure for 1997 the actual gross revenues for 1997, which results in the sum of $35,512. For Soderholm-Wilder, Unity relies on Wilder's testimony that a well-run chiropractic business should see a 10% to 12% increase in gross revenues, and uses 12% to

726

project the increase in gross revenues from 1996 to 1997, then subtracts from that the actual gross revenues, which results in the sum of $49,260. In Unity's view, these sums are the maximum amounts of profits that Teff and Soderholm-Wilder lost because Unity terminated the contract for 1997.

¶ 34. The trial court agreed that contract damages should be offset by losses that were avoided, and decided that Unity had the burden on this issue to present evidence from which the court could make a reasonable estimate of the amount of an offset. The court determined that Unity had not met its burden because exhibit 99 did not separate revenue from Unity patients from revenue from other patients, and it was therefore impossible to determine from that document what the amount of the offset should be.

¶ 35. On appeal, Unity appears to acknowledge in its main brief that it has the burden of proving the revenues that Teff and Soderholm-Wilder would not have earned in 1997 if they had had a contract with Unity for 1997. However, some arguments in Unity's reply brief suggest Unity believes Teff and Soderholm-Wilder had the burden of proof on this issue. To resolve any uncertainty, we will decide the issue, which, since it is a question of law, we review de novo. *Long v. Ardestani*, 2001 WI App 46, ¶ 33, 241 Wis. 2d 498, 519, 624 N.W.2d 405 (the allocation of the burden of proof is a question of law, which we review de novo). We conclude the trial court correctly assigned the burden of proof on this issue to Unity. Although the case law on this point is more than 100 years old, it remains good law: when a defendant contends that the lost profits from a contract breach should be reduced by other business the plaintiff was able to conduct as a result of

not having to perform on that contract, it is the defendant's burden to prove the plaintiff could not have done both. *Nash v. Hoxie*, 59 Wis. 384, 388–90, 18 N.W. 408 (1884).

¶ 36. Unity contends on appeal that it did meet its burden of proof based on the undisputed facts of the revenues as shown on the tax returns and Wilder's testimony on the expected increase in gross revenues of a well-run clinic.[4] While these items of evidence may be undisputed, their use in the particular calculations to prove what Teff and Soderholm-Wilder would have made in 1997 rests upon a number of factual assumptions that were disputed. For example, Unity's method assumes that Teff and Soderholm-Wilder were at full capacity in 1995 and 1996, but there was evidence and reasonable inferences from the evidence indicating they were not. Unity's method also assumes that the proportion of Unity patients to non-Unity patients had no impact on revenue, but there was evidence and reasonable inferences from evidence that it did. In short, there was extensive testimony on a number of factors that affected Teff's and Soderholm-Wilder's revenues, none of which Unity's calculation took into account.

¶ 37. As the trier of fact, it was for the trial court to determine both the credibility of the witnesses, *Gehr v. City of Sheboygan*, 81 Wis. 2d 117, 122, 260 N.W.2d 30, 33 (1977), and the weight to be given to each

---

[4] Many of the facts Unity sets forth in its statement of facts on this issue are from the offer of proof of what the financial expert would have testified to had the court allowed it. Since we have concluded the court properly exercised its discretion in not allowing his testimony, we do not consider his proposed testimony.

witness's testimony, *Milbauer v. Transport Employes' Mutual Benefit Society*, 56 Wis. 2d 860, 865, 203 N.W.2d 135, 138 (1973). We do not overturn the trial court's findings of fact unless they are clearly erroneous. Wis. Stat. § 805.17(2) (2001–02).[5] We conclude the evidence supported the trial court's determination that Unity's calculation was not a reliable basis for determining the amount of revenues Teff and Soderholm-Wilder would have had in 1997 if the contract had not been terminated.

## Defamation Damages

¶ 38. At the evidentiary hearing, Teff and Soderholm-Wilder presented evidence of statements made by Unity representatives to Teff's and Soderholm-Wilder's patients, which included the following: Teff and Wilder charged more than they were worth, they were less competent than Unity's other providers, and they did not want to remain Unity providers. The court found these and other similar statements challenged the professional integrity of Teff and Wilder and conveyed inaccurate information about why they would no longer be Unity providers in 1997. The court also credited Wilder's testimony that Soderholm-Wilder "has never recovered" from the impact of Unity's defamatory statements, and Teff's testimony that his percentage of new patients declined due to Unity's negative comments about his integrity. The court inferred from the testimony of Teff and Wilder and their patients that Unity's statements had harmed Teff's and Wilder's reputations, although it also found that their reputa-

---

[5] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

tions had not been substantially injured because they continued to have successful businesses.

¶ 39. Unity contends there is no evidence to support the award of $10,000 each to Teff and Soderholm-Wilder for defamation damages because they presented no evidence of damages in addition to damages for breach of contract, and the witnesses who were patients testified that Unity's actions had not affected their high esteem for Teff and Wilder.

¶ 40. Slanderous statements that impugn one's business or profession belong to a category typically called "slander per se" and are actionable without proof of pecuniary loss. *Martin v. Outboard Marine Corp.*, 15 Wis. 2d 452, 459, 113 N.W.2d 135 (1962).[6] In such cases "proof of the defamation itself is sufficient to establish the existence of some damages so that the [fact finder] may, without other evidence, estimate the amount of damages." *Starobin v. Northridge Lakes Dev. Co.*, 94 Wis. 2d 1, 13, 287 N.W.2d 747 (1980) (citation omitted).

[6] Either slander (oral) or libel (written) may be the basis for a defamation claim. *Martin v. Outboard Marine Corp.*, 15 Wis. 2d 452, 457, 113 N.W.2d 135 (1962). In contrast to slander, all libels are actionable without alleging or proving special damages. *Id.* at 461–62. Whether based on slander or libel, a defamation claim has these elements: the statement must be false, must be communicated by speech, conduct, or in writing to a person other than the person defamed; and the communication is unprivileged and tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter thirdpersons from associating with him or her. *Mach v. Allison*, 2003 WI App 11, ¶ 12, 259 Wis. 2d 686, 656 N.W.2d 766. In this case, these elements were established by means of the default judgment, although the proof of damages necessarily involved evidence that also would be relevant to prove the elements of the claim.

The nonpecuniary injury that damages in defamation cases compensate for include impairment to reputation and standing in the community, personal humiliation, and mental anguish and suffering. *See Denny v. Mertz*, 106 Wis. 2d 636, 659, 318 N.W.2d 141 (1982), *citing Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349–50 (1974).

¶ 41. When we review a damage award in either a bench or jury trial, we do not substitute our judgment for that of the fact finder, but rather determine whether the award is within reasonable limits, and we view the evidence in the light most favorable to support the damage award. *Cords v. Anderson*, 80 Wis. 2d 525, 552–53, 259 N.W.2d 672 (1977). Applying this standard, we conclude the award of $10,000 to Teff and to Soderholm-Wilder was reasonable. The trial court expressly stated that the damages for defamation could not duplicate the damages for the contract claims, which in any event only extended through 1997, and that the basis for the award was the harm to reputation and professional standing. Teff and Soderholm-Wilder did not have to present evidence that the harm to Teff's and Wilder's reputations translated into a loss of income. The fact that some patients continued to have a favorable impression of Teff and Wilder, in spite of the statements, does not require the trial court to find they suffered no harm to their reputations, because there was other evidence that supported a reasonable inference that the statements had harmed their reputations. As the jury instruction, which the trial court looked to for guidance, provides: "It is not required that [plaintiff] prove damages by any financial yardstick measuring dollars and cents. Injury to reputations, good name,

and feelings are not subject to mathematical calculations or certainty." WIS JI—CIVIL 2516.[7]

*Prejudgment Interest*

■■■

¶ 42. Unity contends the court erred in awarding prejudgment interest on the damages on the breach of contract claims because those damages were not liquidated or liquidable. Since a party's entitlement to prejudgment interest is a question of law, our review on this issue is de novo. *Beacon Bowl v. Wis. Elec. Power Co.*, 176 Wis. 2d 740, 776, 501 N.W.2d 788 (1993).

■■■

¶ 43. The general rule is that prejudgment interest may be recovered only when damages are either liquidated or liquidable, that is, there is a reasonably certain standard of measurement by the correct application of which one can ascertain the amount he or she owes. *Johnson v. Pearson Agri-Systems, Inc.*, 119 Wis. 2d 766, 771, 350 N.W.2d 127 (1984). The most frequently stated rationale for the rule is that if the amount of damages is either liquidated or determinable

---

[7] Unity also makes a brief and undeveloped argument that, as a matter of law, Teff and Soderholm-Wilder were not entitled to any damages because they disseminated the information they alleged was defamatory. Unity refers generally to evidence that Teff and Wilder contacted their patients and informed them that Unity had decided not to contract with them, but does not describe the specific statements Teff and Wilder made to their patients, does not provide a record cite, and does not explain the rather startling implication of their argument that Teff and Wilder made statements that impugned their own professional integrity. Because this argument is so undeveloped, we do not address it. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

by reference to some objective standard, the defendant can avoid the accrual of interest by simply tendering to the plaintiff a sum equal to the amount of damages. *Id.* The case law applying this rule has staked out a middle ground between two competing policies: one policy views interest as a penalty for wrongfully withholding damages legally due, and the other views interest as an element of compensation. *Beacon Bowl,* 176 Wis. 2d at 777. Thus, the cases attempt to balance the right of the injured party to receive full compensation against the right of the withholding party to be free of a claim for interest where refusal to pay the claim is legally justifiable. *Wyandotte Chem. Corp. v. Royal Elec. Mfg.,* 66 Wis. 2d 577, 585, 225 N.W.2d 648 (1975). The question whether damages in a particular case are liquidable is not always easy to resolve. *Dahl v. Housing Auth. of the City of Madison,* 54 Wis. 2d 22, 31, 194 N.W.2d 618 (1972).

¶ 44. In this case the damages on which the court awarded prejudgment interest are: (1) reconciliation payments for 1995 as damages for breach of the 1995 contract, (2) fees for services actually provided Unity patients for one month in 1997 at the request of Unity, and (3) the lost revenues for 1997 resulting from Unity's breach of the terms of the 1996 contract regarding termination of that contract. We examine separately each set of damages to determine whether they are "liquidable," as that term has been defined in the case law.

¶ 45. With respect to the 1995 reconciliation payments, the dispute was whether the method of computation was determined by the addendum alone or by the addendum in conjunction with the Reconciliation Payment Calculation for 1995. Unity contends that when there is a dispute over what is owed under a contract,

the amount owed cannot be ascertained by a reasonably certain standard without a trial, relying on *Loehrke v. Wanta Builders, Inc.*, 151 Wis. 2d 695, 707, 445 N.W.2d 717, 722 (Ct. App. 1989). In *Loehrke*, we concluded that, because there was a real dispute over which of the extra charges by the subcontractor were necessary and properly authorized, prejudgment interest was not due on that amount, but only on the amount that the prime contractor did not dispute at trial. *Id.* at 700, 707. In this case, the dispute over the proper method under the contract for determining the amount of reconciliation payments did not require the resolution of factual issues, and Unity identifies no factual issues that needed to be resolved in order to apply that method. Accordingly, we do not agree that *Loehrke* precludes the award of prejudgment interest on the 1995 reconciliation payments.

¶ 46. Instead, we conclude that the 1995 contract did provide a "reasonably certain method" for determining the amount of the reconciliation payments. The language of the 1995 addendum plainly sets forth that method, and Unity has identified no factual disputes that needed resolution in order to apply that method. Unity could have chosen to stop the interest by paying that amount; instead it chose to advance a construction of the contract that we have concluded is not reasonable. Prejudgment interest in this case is in keeping with the rationale of the rule and strikes the proper balance between full compensation to the plaintiff and the right of the defendant to be free of a claim for interest where refusal to pay is legally justifiable.

¶ 47. Our conclusion is also consistent with *Jones v. Jenkins*, 88 Wis. 2d 712, 726, 277 N.W.2d 815, 821 (1979), which no party cites, but which is helpful

because it concerns prejudgment interest in a case involving the construction of a contract. In *Jones*, the trial court had to construe a contingency fee agreement in order to determine the amount an attorney was owed. The trial court concluded that the contract was ambiguous and took evidence relating to the parties' intent; the construction of the contract was thus a question of fact. *Id.* at 718, 720, 722. The supreme court affirmed both the trial court's ruling that the contract was ambiguous and the trial court's construction of the contract based on the evidence. *Id.* at 725–26. The supreme court also affirmed the denial of prejudgment interest, giving as one reason that "[w]here the dispute goes to the very method of calculating the amount owed, prejudgment interest is not appropriate." *Id.* at 726. In *Jones*, the contract language determining the amount owed was ambiguous, meaning there were two reasonable constructions of that language. *See Borchardt v. Wilk*, 156 Wis. 2d 420, 427, 456 N.W.2d 653 (Ct. App. 1990). In this case there was only one reasonable construction, and, thus, by definition a reasonably certain standard by which Unity could determine the amount of reconciliation payments it owed Teff and Soderholm-Wilder.

¶ 48. With respect to the fee for services Teff and Soderholm-Wilder provided Unity patients for January 1997, Unity agreed during the hearing that it owed Teff and Soderholm-Wilder the amounts they were requesting. That stipulation implicitly concedes that there were no genuine factual disputes that needed resolution in order to determine how much Unity owed for those services. When there is full recovery for work done under a contract and the record shows no more than putting the plaintiff to his or her proof, prejudgment

interest is allowed. *Dahl*, 54 Wis. 2d 22 at 32–33. When, as here, the party who has withheld payment concedes during trial the amount requested is owing, there is an unquestionable entitlement to prejudgment interest. *See Loehrke*, 151 Wis. 2d at 700, 707 (allowing prejudgment interest on the amount conceded at trial).

¶ 49. With respect to the damages for lost revenues for 1997, the analysis is different because these damages were not based on services actually provided by Teff and Soderholm-Wilder. It was necessary to estimate the number of Unity patients Teff and Soderholm-Wilder each would have seen under the contract during 1997, based on evidence of what had occurred in the past, as well as relevant circumstances in 1997, and reasonable inferences from that evidence. The parties disputed which past years and trends should be the basis for an estimate of Unity patients for 1997, whether increased variable costs should be taken into account, and, as discussed in the a preceding section of this opinion, whether Teff and Soderholm-Wilder would have received all the revenues they actually did receive in 1997 in addition to revenues under the contract if it had not been terminated. There was also conflicting evidence over whether Teff and Soderholm-Wilder lost income for new patient referrals as a result of the contract termination; the court found they had not proved this. In short, there were a number of factual issues that needed resolution in order to determine the amount of lost income in 1997.

¶ 50. As we have already stated, in *Loehrke*, 151 Wis. 2d at 707, we did not allow prejudgment interest for the portion of the damage award that required a resolution of factual issues. Subsequently, in *Chevron Chemical Co. v. Deloitee & Touche*, 176 Wis. 2d 935,

951, 501 N.W.2d 15 (1993), the court remanded for a trial on damages for negligent and intentional representation after affirming a default judgment on liability and stated: "Because there are issues of fact regarding damages, the damages are not liquidated or liquidable." In keeping with these cases, we conclude the trial court erred in allowing prejudgment interest on the amount awarded to compensate for lost revenues in 1997. It is true that, once the court decided to use the plaintiffs' projections of the Unity patients they would have served under the contract in 1997, the lost capitation and lost reconciliation payments for 1997 could be readily calculated based on the totals of capitation and reconciliation payments made by Unity in 1997 and the plain contract language. However, the court's decision to use the plaintiffs' projections was the result of its resolution of various factual issues, as was its decision not to allow an offset and its decision not to compensate for lost new patient referrals.

¶ 51. We do not agree with Teff and Soderholm-Wilder that *Weyenberg Shoe Manufacturing Co. v. Seidl*, 140 Wis. 2d 373, 410 N.W.2d 604 (Ct. App. 1987), supports prejudgment interest on lost 1997 income. In that wrongful employment termination case, we concluded in a brief discussion that there was a reasonably certain standard by which to measure those damages, which consisted of wages and benefits lost as a result of the wrongful discharge, and therefore prejudgment interest should have been allowed. *Id.* at 388–89. However, the issues we resolved in that case related to the employer's liability; there is no indication that there were factual issues that needed to be resolved to decide the amount of damages.

*Cross-Appeal—Promissory Estoppel*

¶ 52. The promissory estoppel claim was based on Teff's and Wilder's position that they relied on Unity's representations that they would be awarded "rolling" one-year contracts or a five-year contract and that their relationship would be longterm. As we have explained above, the court entered an order that default judgment be entered on this claim, along with other claims, and scheduled a hearing on damages. In their brief filed after that hearing, Teff and Soderholm-Wilder argued that they were entitled to lost revenues for 1997 and subsequent years based on this claim. One of Unity's responses in its brief was that Teff and Soderholm-Wilder were not entitled to any damages for this claim because a promissory estoppel claim did not lie when there was a contract between the parties. In their reply brief, Teff and Soderholm-Wilder argued that liability on the promissory estoppel claim had been determined by the default judgment.

¶ 53. The trial court agreed with Unity that the plaintiffs were not entitled to damages based on promissory estoppel because they had a contract with Unity that addressed the essential elements of the parties' relationship. The court relied on the rule that a contract is an absolute bar to a promissory estoppel claim, unless it does not embody all the essential elements of the business relationship. *Goff v. Massachusetts Protective Assoc., Inc.*, 46 Wis. 2d 712, 717, 176 N.W.2d 576 (1970); *Kramer v. Alpine Valley Resort, Inc.*, 108 Wis. 2d 417, 421, 321 N.W.2d 293, 295 (1982). The court explained that the default judgment had relieved the plaintiffs of proving the first two elements of the claim,

which are factual, but that the third element remained a policy issue for the court in spite of the default judgment.[8]

¶ 54. On their cross-appeal, Teff and Soderholm-Wilder contend the trial court did not have the authority to rule on the third element of the promissory estoppel claim at the time and using the procedure that it did. They acknowledge that the third element of the claim was a matter for the court to decide, but assert, as they did in the trial court, that the default judgment necessarily entailed a conclusion by the trial court that they were legally entitled to judgment on that claim, which includes a conclusion that the third element was met. In their view, the court could reconsider that conclusion only under WIS. STAT. § 805.17(3), which requires that amendments to a trial court's findings and conclusions be made within twenty days and after the parties have had the opportunity to be heard. Since the court did not comply with § 805.17(3), they assert, they are entitled to reinstatement of the promissory estoppel claim and a remand for a trial on damages for this claim.

¶ 55. Unity does not agree that the default judgment entailed a decision that the third element of the claim was established. It therefore responds that the

---

[8] The elements of a claim for promissory estoppel are a promise that: (1) the promisor reasonably should have expected would induce substantial action or inaction, (2) did induce such action or inaction, and (3) must be enforced in order to avoid injustice. *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 698, 133 N.W.2d 267 (1964). Whether the first two elements have been established is a question for the trier of fact; whether the third element has been established is a policy decision for the court. *U.S. Oil v. Midwest Auto Care Services*, 150 Wis. 2d 80, 89, 440 N.W.2d 825 (Ct. App. 1989).

court did not reconsider anything, but instead properly made the decision on the third element after the evidentiary hearing on damages. Alternatively, Unity argues that even if the court did reconsider a prior ruling, WIS. STAT. § 805.17(3) does not apply.

¶ 56. Whether the court acted within its statutory or common law authority presents a question of law, which we review de novo. *See Harvest Sav. Bank v. ROI Inv.*, 228 Wis. 2d 733, 737, 598 N.W.2d 571 (Ct. App. 1999).

¶ 57. In resolving this issue, we need not decide whether the default judgment necessarily implied a conclusion that the third element was established as well as the first two. Even if it did, nothing precluded the court from considering the issue when raised by Unity in its brief after the hearing on damages. A court has the inherent authority to reconsider a nonfinal ruling any time prior to the entry of the final order or judgment. *Fritsche v Ford Motor Credit Co.*, 171 Wis. 2d 280, 293–94, 491 N.W.2d 119 (Ct. App. 1992). The order for the entry of a default judgment was not a final order, because it expressly ordered further proceedings to determine damages.

¶ 58. We reject Teff's and Soderholm-Wilder's argument that the court was limited to acting within the confines of WIS. STAT. § 805.17(3). That subsection provides in part:

> (3) RECONSIDERATION MOTIONS. Upon its own motion or the motion of a party made not later than 20 days after entry of judgment, the court may amend its findings or conclusions or make additional findings or conclusions and may amend the judgment accordingly. The motion may be made with a motion for a new trial.

Our analysis of § 805.17(3) in *Continental Casualty Co. v. Milwaukee Metropolitan Sewerage District*, 175 Wis. 2d 527, 533–34, 499 N.W.2d 282 (Ct. App. 1993), is pertinent. There we concluded that § 805.17(3) did not apply to a motion for reconsideration of a summary judgment. We based this conclusion on the following: (1) minutes from Judicial Council meetings that indicated this was intended to apply only to bench trials; (2) the context of this subsection—in a section entitled "Trial to the Court" establishing procedures for trials to the court and in a chapter entitled "Trials"; and (3) on the language of the subsection, which refers to "findings." *Id.* at 532–34. With respect to the last factor, we pointed out that courts do not make findings at the summary judgment stage. *Id.* at 533–34.

¶ 59. Teff and Soderholm-Wilder argue that our reasoning in *Continental Casualty* is not applicable here, because a trial court does make findings of fact in deciding whether the criteria for granting a default judgment are met, unlike in a summary judgment proceeding. We disagree for two reasons: first, the findings on egregiousness and justifiable excuse were not the subject of reconsideration by the court; rather, to the extent the court reconsidered anything, it was whether a default judgment should have been entered on the promissory estoppel claim in view of the legal principles applicable to that claim. More importantly, the first two bases for our decision in *Continental Casualty* compel the conclusion in this case that WIS. STAT. § 805.17(3) does not apply: a default judgment on liability is not the result of a trial.

¶ 60. Teff and Soderholm-Wilder also assert they did not have notice that the court was going to reconsider the default judgment on the promissory estoppel claim before the hearing on damages, and this preju-

diced them because they did not have the opportunity to present evidence that the contract with Unity did not govern all essentials of their relationship with Unity. However, they do not provide any detail as to what evidence they would have presented, and they are not seeking as a remedy on appeal the opportunity to that evidence. In the trial court they had the opportunity to present argument to the trial court in response to Unity's post-trial brief, and they did. They did not in that brief request a hearing to present additional evidence or identify the evidence they would have presented had they known Unity was going to raise this issue. The best we can glean from their brief on appeal is that they would have presented evidence that Unity promised a long-term relationship and continued renewals of the contract and, since these promises were not embodied in the written contract, the written contract did not govern all the essentials of their relationship. However, this is evidence of the promises they assert were made; it does not address the completeness of the contract. In short, Teff and Soderholm-Wilder have not persuaded us that their substantial rights were affected by not knowing before the hearing on damages that Unity was going to raise the contracts as a bar to the promissory estoppel claim.

¶ 61. Turning to the merits of the court's decision on this issue, Teff and Soderholm-Wilder have identified no error, and we conclude there is none. We agree with the trial court that the plain language of the 1995 and 1996 contracts addressed the essentials of the business relationship between Unity on the one hand, and Teff and Soderholm-Wilder on the other. Most important for purposes of this case, the contracts were clearly limited to terms of one year with clear provi-

sions for renewal and for termination. The trial court correctly reasoned that the very purpose of the rule is to prevent a party from accomplishing under a promissory estoppel claim what it cannot accomplish under the principles of contract construction—resort to extrinsic evidence to establish terms of a contract that are not contained in the plain language of the contract and are inconsistent with it. Accordingly, we affirm the trial court's ruling that Teff and Soderholm-Wilder were not entitled to damages on the promissory estoppel claim.

*By the Court.*—Judgment and order affirmed in part; reversed in part and cause remanded with directions.