CITY OF STOUGHTON, Plaintiff-Respondent-Cross-Appellant,

v.

THOMASSON LUMBER COMPANY, Defendant-Appellant-Cross-Respondent.†

Court of Appeals

*No. 02–2192. Oral argument July 14, 2003.—Decided December 23, 2003.*

2004 WI App 6

(Also reported in 675 N.W.2d 487.)

† Petition to review dismissed 2-10-04.

339

340

341

On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the briefs of *Edward A. Corcoran, Brennan, Steil, Basting & Mac-*

*Dougall*, Madison, and *T. Gregory Slother, Barr, Murman, Tonelli, Slother & Sleet*, Florida. There was oral argument by *Edward A. Corcoran*.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of *Richard J. Delacenserie, Alan G.B. Kim, Jr.*, and *Michael A. Dodge, Davis & Kuelthau, S.C.*, Madison. There was oral argument by *Alan G.B. Kim, Jr.*

Before Deininger, P.J., Dykman and Vergeront, JJ.

¶ 1. VERGERONT, J. The City of Stoughton filed this action for breach of implied warranty against Thomasson Lumber Company, claiming that 225 telephone poles the City purchased from the company were not merchantable at the time of delivery. After a trial to the court, the court entered judgment against Thomasson Lumber, and Thomasson Lumber appeals. We conclude: (1) the trial court did not erroneously decide that an implied warranty could contain a warranty on future performance of the poles, but rather properly considered the generally expected service life of like poles in determining whether these poles were merchantable at the time of delivery under Wis. Stat. § 402.314(2) (2001–02)[1]; (2) the trial court did not err in evaluating the expert testimony; (3) the trial court did not erroneously exercise its discretion in treating pleadings of Thomasson Lumber as admissions of a party opponent; (4) the evidence supported the trial court's findings that the poles did not meet the requirements for merchantability at the time of delivery; and (5) the evidence supported the trial court's finding that the

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

City mitigated its damages. We therefore affirm the judgment against Thomasson Lumber.[2]

¶ 2. The City cross-appeals the trial court's decision to limit recovery for replacement costs to only 189 of the 225 poles replaced. This limitation was a sanction for the City's failure to mark for identification purposes poles it had to cut up for removal. For the reasons we explain below, we reverse and remand for further proceedings on this issue.

## BACKGROUND

¶ 3. In 1990 and 1991, the City purchased 225 utility poles from Thomasson Lumber. The poles were treated for Thomasson Lumber with copper/naphthenate (copper nap) at a facility owned by Olon Belcher Lumber Company. The purchase specifications drafted by the City required that the poles be southern yellow pine, be treated with copper nap to a .06 retention, meet the standards of the American National Standards Institute (ANSI) and American Wood Preservers Association (AWPA), and be indepen-

---

[2] Thomasson Lumber also challenges the trial court's findings that the requirements of WIS. STAT. § 402.315 were met and therefore this statute applied as well as WIS. STAT. § 402.314. Under § 402.315, if certain conditions are met, there is an implied warranty that the goods shall be fit for a particular purpose for which the goods are required. The trial court found the particular purpose was the same as the ordinary purpose under § 402.314(2)(c)—use as utility poles—and that the City succeeded in showing lack of fitness for the ordinary purpose for the same reasons that it succeeded in showing lack of fitness for the particular purpose. Because we affirm the trial court's findings under § 402.314(2)(c), it is not necessary for us to separately address § 402.315.

dently inspected prior to delivery to the City.[3] Thomasson Lumber selected McCallum Inspection Company to perform the independent inspection. The City installed the poles for use to support electrical lines for homes and businesses in the City.

¶ 4. In January 1993, the Rural Electrification Administration, a United States government agency, sent a warning to electric utilities, including the City's electric utility, advising that the agency had received reports from three electric cooperatives that poles treated with copper nap were deteriorating after only two to three years; the agency advised purchasers of such poles since 1988 to visually inspect and sound the poles. The next month Thomasson Lumber sent its own alert to its copper nap pole customers recommending that they inspect their poles promptly because some customers had experienced premature decay in their poles. In June, a Thomasson Lumber employee performed an inspection of the City's copper nap poles, which consisted of sounding and boring approximately thirty to forty poles. He found one decayed pole and offered to refund the City the purchase price of the rotting pole.

¶ 5. In April 1994, three poles broke in a windstorm. They broke off about ten feet from the top of the poles, and the poles were rotten inside. The City notified Thomasson Lumber of this. That same month Hugh Thomasson of Thomasson Lumber inspected the poles, as did an employee of Olon Belcher. The substance of the conversations between Thomasson and

---

[3] ANSI sets forth minimum industry standards for untreated utility poles and AWPA sets forth minimum industry standards for wood preserving.

346

the City and between the Olon Belcher employee and the City concerning these inspections was disputed at trial.

¶ 6. On August 4, 1994, another copper nap pole collapsed, causing a fire, and the City filed this lawsuit shortly thereafter. After consulting with a pole inspection company, Osmose Wood Preserving, Inc., and with Forester Engineering, the City ultimately removed and replaced all but one of the poles in 1995. When the City discovered the remaining pole in 1999, it replaced it.

¶ 7. Prior to trial, Thomasson Lumber filed a motion in limine requesting that the City be precluded from presenting any evidence or argument regarding poles that were not produced by the City for inspection by Thomasson Lumber, and also requesting that the City be precluded from requesting any damages regarding those poles. The City in response filed an affidavit averring that some of the poles had to be cut for safe removal and replacement of the poles, but that all those that had been removed were made available to Thomasson Lumber. The court, the Honorable Judge Robert Pekowsky presiding, concluded that, while some of the poles had to be cut up for removal, the City did not meet its responsibility to preserve evidence because it failed to mark the cut poles so that Thomasson Lumber could determine the specific pole from which a cut piece came. The court therefore ruled that the City was "precluded from introducing evidence regarding the thirty-two[4] [sic] poles which were not adequately preserved for litigation."

---

[4] Given the trial court's finding that the City purchased 225 poles, and the evidence that when Thomasson Lumber inspected the poles in 1997 there were 188 identifiable poles, with the 189th pole discovered in 1999, it appears there were thirty-six poles that were cut but not adequately marked.

¶ 8. The trial was to the court, the Honorable Diane Nicks presiding. The court issued a lengthy written decision analyzing the factual and legal disputes of the parties. The court applied WIS. STAT. § 402.314,[5] which governs implied warranties of merchantability, and determined that the City had shown that at least three of the six requirements for merchantable goods were not met: (1) the poles would not pass without objection in the trade under the contract description; (2) they were not of fair average quality within the description; and (3) they were not fit for the ordinary purposes for which such goods were used. Section 402.314(2)(a)-(c).

---

[5] WISCONSIN STAT. § 402.314(1)-(2) provide:

**Implied warranty: merchantability; usage of trade. (1)** Unless excluded or modified (s. 402.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

**(2)** Goods to be merchantable must be at least such as:

(a) Pass without objection in the trade under the contract description; and

(b) In the case of fungible goods, are of fair average quality within the description; and

(c) Are fit for the ordinary purposes for which such goods are used; and

(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) Are adequately contained, packaged, and labeled as the agreement may require; and

(f) Conform to the promises or affirmations of fact made on the container or label if any.

¶ 9. The court rejected Thomasson Lumber's argument that the City had not mitigated its damages because it removed and replaced all the poles instead of inspecting each pole and then remedially treating each pole based on the results of the inspection. The court determined that Thomasson had not shown that a single inspection and single treatment would suffice to ensure that the poles left standing would reliably perform for a significant period of time. Therefore, the court found, the City would need to continue to incur the costs of repeating this process in an attempt to have the poles safely and reliably perform over the customary thirty-year pole life. The court also determined that it was reasonable for the City to replace all the poles rather than incur the risk to persons and property from decaying poles. However, the court agreed with Thomasson Lumber that it should not award damages for the City's cost of replacing the poles that were not available for inspection because the City had cut them up without marking them. The court awarded the City a total of $223,394.76 for the cost of replacing 189 poles, plus the interest on the loan the City took out in order to pay for replacement of those poles, plus the costs for paying the two companies for inspection and consultation.

## DISCUSSION

### I. Appeal

#### A. *Post-Delivery Performance*

¶ 10. Thomasson Lumber contends the trial court erred in considering the post-delivery performance of the poles when the court determined whether the requirements of WIS. STAT. § 402.314(2) were met. According to Thomasson Lumber, *Selzer v. Brunsell*

*Brothers, Ltd.*, 2002 WI App 232, 257 Wis. 2d 809, 652 N.W.2d 806, holds that implied warranties do not contain any warranty of future performance, and the court here found a warranty of future performance when it found the poles had an "expected service life . . . between 30 and 40 years." The City responds that *Selzer* is not applicable because it addressed an issue not present in this case: whether the exception in WIS. STAT. § 402.725(2), governing the accrual of a cause of action when "a warranty explicitly extends to future performance of the goods," applies to an implied warranty.

██

¶ 11. This issue presents a question of law, because it involves statutory construction, and our review is therefore de novo. *Hughes v. Chrysler Motors Corp.*, 197 Wis. 2d 973, 978, 542 N.W.2d 148 (1996).

¶ 12. We agree with the City that our analysis in *Selzer* is not applicable to this case. Thomasson Lumber relies on the statement in *Selzer*, quoted from *Marvin Lumber & Cedar Co. v. PPG Industries, Inc.*, 223 F.3d 873, 879 (8th Cir. 2000), that " '[i]mplied warranties, cannot, by their very nature, explicitly extend to future performance.' " 257 Wis. 2d 809, ¶ 24. When placed in context, this statement simply means that an implied warranty by definition is not an "explicit" warranty of anything and thus is not a warranty that "explicitly extends to future performance of goods" within the meaning of WIS. STAT. § 402.725(2).[6]

---

[6] Thomasson Lumber cites a number of cases from other jurisdictions which, like *Selzer v. Brunsell Bros., Ltd.*, 2002 WI App 232, 257 Wis. 2d 809, 652 N.W.2d 806, were concerned with the application of statutes based on U.C.C. § 2–725(2) to a claim for a breach of implied warranty. We consider them inapplicable for the same reason that *Selzer* is inapplicable.

¶ 13. Thomasson Lumber's reliance on *Selzer* confuses the legal question of whether an implied warranty may contain a warranty that "explicitly extends to future performance of the goods" with the factual questions involved in determining whether the requirements of Wis. Stat. § 402.314(2) are met. Evidence that the goods break or physically deteriorate after delivery may be relevant to whether the goods were fit at the time of delivery for the ordinary purpose for which they are used; but consideration of such evidence for that purpose does not impose an express warranty for future performance, as Thomasson Lumber contends. Indeed, we recognized in *Selzer* the very distinction that Thomasson Lumber blurs when we said: "While all warranties in a general sense apply to the future performance of goods, the future performance exception [in Wis. Stat. § 402.725(2)] applies only where the warranty '*explicitly* extends to future performance.' "[7] 257 Wis. 2d 809, ¶ 20 (quoting § 402.725(2)). As the City points out, Wisconsin courts have considered evidence of what happens to goods after delivery to decide whether they are fit for the ordinary purposes under § 402.314(2)(c), *see Titus v. Polan*, 72 Wis. 2d 23, 24–26, 240 N.W.2d 420 (1976) (evidence that pump installed in November 1973 failed in August 1974 because the motor was defective establishes that pump was not fit for ordinary purpose) or fit for a particular purpose under Wis. Stat. § 402.315, *see Calumet Cheese Co. v.*

---

[7] We also held in *Selzer* that an express promise of "permanently protecting against rot and decay," like promises of "reliability" and "long service," did not constitute an "explicit" warranty of "future performance" because it did not make a specific reference to a future, determinable time. 257 Wis. 2d 809, ¶¶ 19–23.

*Chas. Pfizer & Co.*, 25 Wis. 2d 55, 58–59, 63, 130 N.W.2d 290 (1964) (substance was not fit for the particular purpose of use as an additive to cheese because it caused the cheese to develop a bad odor and flavor).

■

¶ 14. The trial court's analysis here is consistent with these decisions. The court did not find that Thomasson Lumber had expressly warranted that the poles would last between thirty and forty years. Rather, the court found, based on the evidence, that this was the expected service life of like utility poles, and the court considered this evidence along with other evidence in finding that the poles were not fit for the ordinary purpose for which such poles are used.

B. *Expert Testimony*

¶ 15. The City and Thomasson Lumber each presented expert testimony that was in direct conflict on critical points. The City's expert, Dr. William Smith, reviewed the investigation of all the poles conducted by Osmose Wood Preserving in 1994 and the results of the investigation of 188 poles conducted by Thomasson Lumber's expert, Dr. Darryl Nicholas, in 1997. Smith also inspected those 188 poles himself and randomly tested them. He opined that the poles were an "abnormal" population because they had an "irrationally" high rate of decay, irregular penetration, and decay toward the top rather than at the ground line, and this abnormal character made it impossible to predict which poles would fail in the future. In contrast, Smith described a pole properly treated with copper nap as having an average service life of thirty to fifty years, meaning that a majority of the individual lives would cluster in the middle, and a failure before fifteen years would not be expected. According to Smith, the City's poles were not

fit for their ordinary purpose, were not of fair, average quality, were not of even quality, and did not meet the industry standards as represented by the brand.

¶ 16. In contrast, Nicholas testified that the City's poles would pass in the trade without objection, were of fair and average quality, were fit for their ordinary purpose, and were of even kind, quality, and quantity under applicable industry standards. Based on his inspection of the 188 poles in 1997, and taking into account the passage of time and the manner in which the poles had been stored after removal, he opined that the poles had been treated to appropriate penetration and retention levels.

¶ 17. The trial court analyzed in detail the testimony of both Smith and Nicholas, explaining why it did not consider Nicholas's testimony persuasive on several points and why it accepted Smith's opinions rather than Nicholas's.

¶ 18. Thomasson Lumber contends the trial court erred in relying on Smith's testimony. According to Thomasson Lumber, Smith "disavowed" his status as an expert because he did not conduct an adequate investigation of the poles. Thomasson Lumber relies on *Green v. Smith & Nephew AHP, Inc.*, 2000 WI App 192, ¶ 23, 238 Wis. 2d 477, 617 N.W.2d 881, in which we concluded that opinion testimony was erroneously admitted because the witness admitted that the opinion was outside his area of expertise. *Green* has no relevance to this case because Smith made no admission of a lack of expertise. Once the relevancy of evidence is established and the witness qualifies as an expert, whether to credit that expert's testimony and the weight to give it are judgments for the fact finder to make. *See State v. Peters*, 192 Wis. 2d 674, 690, 534 N.W.2d 867 (Ct. App. 1995).

353

That includes the judgment whether Smith's investigation was adequate to support the opinions he gave.

¶ 19. Thomasson Lumber also relies on *Weber v. White*, 2003 WI App 240, ¶ 15, 267 Wis. 2d 862, 672 N.W.2d 151, *review granted*, 2004 WI 1 (Wis. Dec. 16, 2003) (No. 03–0471), which it brought to our attention as a supplemental authority. *Weber*, too, is inapplicable. In *Weber*, an expert expressly stated on cross-examination that he could not give an opinion to a reasonable degree of chiropractic certainty on future health care expenses; we therefore concluded there was no evidence properly before the jury of future health care expenses. *Id.* In this case, Smith testified that in his opinion to a high degree of scientific certainty or probability, the decay in the poles was caused by fungi that were introduced at or prior to the treatment process in one or more of three primary ways; but he acknowledged he could not, on the basis of the investigation he had made, opine to the requisite degree of certainty which of these three caused the decay in a specific pole. Smith's inability to give an opinion to the requisite degree of certainty on the cause of decay in a specific pole does not render inadmissible the opinions he did give to the requisite degree of certainty. Whether to accept the opinions he gave to the requisite degree of certainty in view of the opinions he could not give is a judgment for the trial court as fact finder to make. *See Peters*, 192 Wis. 2d 674 at 690.

¶ 20. On much the same basis, we reject Thomasson Lumber's contention that the trial court improperly disregarded and mischaracterized Nicholas's testimony. The court did not disregard his testimony but chose to rely instead on Smith's opinion on certain points where their opinions were in conflict. That is properly the role

of the fact finder. *See Gegan v. Backwinkel,* 141 Wis. 2d 893, 901, 417 N.W.2d 44 (Ct. App. 1987). Thomasson Lumber presents explanations for aspects of Nicholas's testimony that the trial court found not persuasive or inconsistent with other evidence. However, whether there is a more favorable assessment of Nicholas's testimony is irrelevant: it is the trial court's role to decide how to assess his testimony and how to reconcile it with other evidence.

C. *Admissions Based on Pleadings*

¶ 21. In deciding whether the poles would pass without objection in the trade under the contract description and were of fair average quality within the description, Wis. Stat. § 402.314(2)(a)-(b), the court considered pleadings Thomasson Lumber had filed against Olon Belcher and McCallum: a complaint filed in June 1994 in a federal district court in Alabama against both companies and the cross-complaint filed against Olon Belcher in this action. The complaint in the Alabama lawsuit alleged that Thomasson Lumber had delivered untreated utility poles to Olon Belcher to be treated with copper nap in accordance with an agreement with Olon Belcher dated January 20, 1989, and had entered into a contract with McCallum to inspect the poles after treatment by Olon Belcher to confirm that the copper nap adequately penetrated the poles. The complaint further alleged that Thomasson Lumber had received numerous complaints from its customers that utility poles treated by Olon Belcher and inspected by McCallum were degrading in service, and inspections by Thomasson Lumber confirmed that these poles had become rotten and decayed. The poles were rotting and decaying, the complaint alleged, because of improper treatment by Olon Belcher and inadequate inspection by McCallum and were "defective

and [could not] be used for their intended purpose." Thomasson Lumber's cross-claim in this action makes similar allegations.

¶ 22. The trial court rejected the City's position that the court should treat these pleadings as conclusively establishing the facts alleged and should preclude Thomasson Lumber from presenting any evidence to the contrary. However, the court did decide to treat the pleadings as admissions by Thomasson Lumber that at least the most severely rotten and decayed of the City's poles were defective and could not be used for their intended purpose. Thus, the court did not treat the pleadings as conclusively establishing any fact, but instead treated them as evidence to be considered along with other evidence.

¶ 23. Thomasson Lumber contends the trial court erroneously exercised its discretion in considering these pleadings as admissions because, as the court itself recognized, it could not determine the number of poles Thomasson was referring to in the pleadings.

¶ 24. "A positive statement of an evidentiary fact made by a party in a pleading in another case may be sufficient to constitute an admission," in which case the admission is substantive evidence of the facts admitted. *Kraemer Bros., Inc. v. United States Fire Ins. Co.*, 89 Wis. 2d 555, 569, 278 N.W.2d 857 (1979). Generally, the question of the admissibility of evidence is a matter within the trial court's discretion. *See Martindale v. Ripp*, 2001 WI 113, ¶ 28, 246 Wis. 2d 67, 629 N.W.2d 698.

¶ 25. We see no erroneous exercise of discretion here. The pleadings are not inadmissible hearsay. Under Wis. Stat. § 908.01(4)(b)4, a statement made by a

356

party's agent within the scope of the agency and offered against the party is not hearsay. Thomasson Lumber's objection appears to go to relevancy, but we conclude a reasonable court could decide they were relevant. Although the allegations in the Alabama complaint did not specifically identify the poles complained of as those sold to the City, the evidence was that when Thomasson Lumber filed the lawsuit, it knew of the City's problems with the poles and knew the City was requesting replacement of all poles. The trial court could therefore reasonably infer that the Alabama complaint related to the poles Thomasson Lumber sold the City, which had been treated by Olon Belcher and inspected by McCallum. It is also logical to conclude that Thomasson Lumber's cross-complaint against Olon Belcher was complaining of the poles that were the subject of the City's complaint against Olon Belcher. The fact that neither pleading specifies the number of poles that Thomasson Lumber asserted had been negligently treated by Olon Belcher does not mean that the pleadings are not admissible as evidence that Olon Belcher's inadequate treatment of poles sold by Thomasson Lumber resulted in decay of those poles.

¶ 26. Thomasson Lumber also relies on *Fletcher v. Eagle River Memorial Hospital, Inc.*, 156 Wis. 2d 165, 177, 456 N.W.2d 788 (1990), but that case is not applicable. *Fletcher* addresses a "judicial admission," which occurs when the court treats a statement by a party or a party's attorney as a concession that forecloses the party from submitting evidence to contradict the concession. *Id.* The court in *Fletcher* cautioned that in exercising discretion whether to treat a statement as a judicial admission, trial courts must make a "searching inquiry" before reaching "the conclusion that a party has voluntarily foregone the opportunity to prove

357

or to contest a critical factual element of the lawsuit." *Id.* Thomasson Lumber relies on this statement. However, as we have already explained, the court did not preclude Thomasson Lumber from submitting evidence that might contradict the statements in its pleadings, and the court's analysis in deciding to admit the pleadings as evidence against Thomasson Lumber was a proper exercise of discretion.

### D. *Sufficiency of Evidence Regarding Each Pole*

¶ 27. Thomasson Lumber contends the evidence did not establish that each of the 189 poles for which the court awarded damages was not merchantable at the time of delivery. According to Thomasson Lumber, because some poles showed no signs of decay when the City removed them, the court erred in finding that all 189 poles were defective at the time of delivery.

¶ 28. When we review a trial court's factual findings, we affirm unless the finding is clearly erroneous. WIS. STAT. § 805.17(2). We do not consider the evidence that might have supported contrary findings, but instead search the record for evidence to support the findings the trial court did make. *Becker v. Zoschke*, 76 Wis. 2d 336, 347, 251 N.W.2d 431 (1977). When the evidence supports the drawing of either of two conflicting inferences, the trial court, not this court, decides which inference to draw. *State v. Friday*, 147 Wis. 2d 359, 370–71, 434 N.W.2d 85 (1989). In addition, judgments on the weight of the evidence and on the credibility of the witnesses are for the trial court sitting as finder of fact to make, not this court. *State v. Douglas D.*, 2001 WI 47, ¶ 100 n.36, 243 Wis. 2d 204, 626 N.W.2d 725.

¶ 29. The trial court here chose to accept Smith's testimony that the poles had incipient decay at the time of delivery as a result of deficiencies in the treatment process. The evidence was that incipient decay, as well as decay, is a prohibited defect under the ANSI standards, which defines incipient decay as "an early stage of decay that has not proceeded far enough to soften or otherwise perceptibly impair the hardness of the wood . . . [and] is usually accompanied by a slight discoloration or bleaching of the wood." There was testimony that properly treated utility poles should have no decay or failures for fifteen to twenty years after being placed in service, and that a failure of even 1% of a pole population within the first five years meant that something was drastically wrong with that pole population. From this evidence, as well as much other evidence the circuit court carefully explained in its decision, a reasonable fact finder could infer that each of the poles was defective at the time of delivery and that, as a result of the defect, the first three requirements of Wis. Stat. § 402.314(2) were not met.

¶ 30. Thomasson Lumber apparently believes the City had to prove that each pole was observed to have exhibited decay, but this confuses the nature of the evidence with the fact to be proved. Evidence that a particular pole was rotten within five years of delivery may be one way to prove that particular pole was defective at the time of delivery, but it is not the only way. Evidence, including reasonable inferences from the evidence, that all poles were subject to a deficient treatment process is another way to prove that each of the poles was defective at the time of delivery.

¶ 31. Thomasson Lumber incorrectly relies on *J.I. Case Plow Works v. Niles & Scott Co.*, 90 Wis. 590,

359

607–08, 63 N.W. 1013 (1895), for support of its argument that the City must prove that each pole exhibited decay. In that case, the court concluded there was no basis in the record for inferring that goods that had not been returned were defective. *Id.* That court did not have before it, as we do, a record that provides a basis for a reasonable inference that all the goods were defective because of a deficiency in a process that all were subject to.

E. *Mitigation of Damages*

■■■■■

¶ 32. WISCONSIN STAT. § 402.714 governs damages for a breach of implied warranty in this case.[8] As in cases where there is a breach of a contract, the party aggrieved by a breach of implied warranty has an

---

[8] WISCONSIN STAT. § 402.714 provides:

 **Buyer's damages for breach in regard to accepted goods. (1)** Where the buyer has accepted goods and given notification (s. 402.607 (3)) the buyer may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

 **(2)** The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

 **(3)** In a proper case any incidental and consequential damages under s. 402.715 may also be recovered.

WISCONSIN STAT. § 402.715 provides:

 **Buyer's incidental and consequential damages. (1)** Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commer-

360

obligation to take reasonable steps to minimize damages. *See Sprecher v. Weston's Bar, Inc.*, 78 Wis. 2d 26, 42, 253 N.W.2d 493 (1977) (discussing breach of contract). The burden is on the breaching party to establish that the aggrieved party has not reasonably minimized damages. *Id.*

■

¶ 33. Thomasson Lumber contends that the only credible evidence relating to what steps were reasonable for the City to take was that of Osmose Wood Preserving, which recommended the immediate removal of seven poles that were dangerous and the remedial treatment of others that showed signs of decay. However, the trial court explained in detail why it determined that the City acted reasonably in not following this recommendation: (1) Osmose found decay in 65% of the poles when testing from ground to a foot above the brand; however the poles that had broken had typically broken toward the top. (2) A pole not recommended by Osmose for removal broke and fell down shortly after its inspection. (3) Osmose itself recommended against traditional inspection and treatment methods because there was no consistent pattern on where the severe decay was located and, in the

cially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include:

(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) Injury to person or property proximately resulting from any breach of warranty.

majority of poles, decay was found above the locations that would be covered by traditional methods. (4) There was no evidence that a single "top to bottom" inspection and treatment as recommended by Osmose would be sufficient to solve the problem of the premature decay.

¶ 34. The trial court also discussed in detail the information the City gathered in deciding whether it needed to replace all the poles and determined, based on that information, that the City acted reasonably in replacing the poles. Thomasson Lumber makes a number of objections to the court's analysis and characterizes them as questions of law. However, we are satisfied that Thomasson Lumber is simply urging us to take a different view of the evidence than did the trial court. That, as we have already explained, is not our function.

¶ 35. Thomasson Lumber also asserts that the court made an error of law in considering the risk of defective poles as a factor in analyzing whether the City acted reasonably in replacing all of the poles. According to Thomasson Lumber, the risk of injury to persons or property is not admissible in this context under the economic loss doctrine. Thomasson Lumber cites *Selzer*, 257 Wis. 2d 809, ¶ 39, and *Northridge Co. v. W.R. Grace & Co.*, 162 Wis. 2d 918, 933, 471 N.W.2d 179 (1991), but neither supports Thomasson Lumber's position. The economic loss doctrine, when it applies, bars recovery in tort for damages resulting from a product not performing as intended, including damages to the product itself or economic losses caused by the defective product. *Selzer*, 257 Wis. 2d 809, ¶ 33. The plaintiff in *Selzer* sought recovery in tort for damage to his house caused by defective windows, and we concluded those damages were barred by the economic loss doctrine. *Id.*, ¶ 39. (Earlier in the opinion in *Selzer*, we held that recovery for breach of warranties was barred by the

statute of limitations. *Id.*, ¶¶ 23–24.) In *Northridge,* the plaintiff sought recovery in tort for damages caused by asbestos and the court decided the claims were not barred by the economic loss doctrine because the alleged damage was physical injury to other property. 162 Wis. 2d at 923.

¶ 36. The City here is not seeking damages in tort, but for breach of implied warranty. It is not seeking damages for injuries to person and property, but for the cost of replacing the poles and related expenses. In any event, the economic loss doctrine does not bar the recovery of damages for injury to persons or other property resulting from a defective product; in fact, Wis. Stat. § 402.715(2)(b) specifically allows it when caused by a breach of warranty. Most importantly for the purposes of this case, nothing in the economic loss doctrine precludes the trial court from considering the risk of injury to persons and other property from decaying poles when considering whether the City acted reasonably in replacing the poles.

II. Cross-Appeal

¶ 37. The City's cross-appeal challenges the trial court's decision not to award damages for thirty-six of the poles that had been cut up when removed and not marked. The City contends Judge Nicks erroneously construed Judge Pekowsky's ruling, because he simply excluded evidence of the thirty-six poles and did not preclude the recovery of damages for replacing them. The effect of Judge Nicks's decision, the City argues, is dismissal of its claim for damages for those thirty-six poles. According to the City, such a sanction requires egregious conduct, which is not present here. Thomasson Lumber responds that Judge Pekowsky did intend

to preclude damages for the thirty-six poles, and the record shows egregious conduct by the City because the poles were cut without being marked after this litigation began, when the City was well aware of the need to identify the poles that samples were taken from.

¶ 38. As both parties recognize, the decision whether to impose a sanction for the spoliation of evidence is committed to the trial court's discretion. *Garfoot v. Fireman's Fund Ins. Co.*, 228 Wis. 2d 707, 717, 599 N.W.2d 411 (Ct. App. 1999).[9] We affirm discretionary rulings if the trial court examined the relevant facts, applied a proper standard of law, and utilizing a demonstrably rational process, reached a reasonable conclusion. *Id.* In *Garfoot*, we reaffirmed the proposition that dismissal as a sanction for destruction of evidence requires a finding of egregious conduct, which means a conscious attempt to affect the outcome of litigation or a flagrant knowing disregard of the judicial process. *Id.* at 724. We arrived at this reaffirmation after reconciling *Milwaukee Constructors II v. Milwaukee Metropolitan Sewerage District*, 177 Wis. 2d 523, 502 N.W.2d 881 (Ct. App. 1993), in which we had applied this standard, with a later decision, *Sentry Insurance Co. v. Royal Insurance Co.*, 196 Wis. 2d 907, 539 N.W.2d 911 (Ct. App. 1995), which could arguably be read as requiring only negligence for the sanction of dismissal. *Garfoot*, 228 Wis. 2d at 722–24.

¶ 39. Thomasson Lumber appears to agree with the City that not allowing damages for replacement of

---

[9] In this case, as we have already stated, the City did not destroy the thirty-six poles but cut them up without identifying which pieces were part of which pole. The City implicitly concedes that this constitutes spoliation of evidence.

the thirty-six poles is effectively the same as dismissing a claim as to each of those poles and is permissible only if there was egregious conduct by the City. We accept this concession because we can see no meaningful distinction between dismissal of a claim as a sanction and not allowing the recovery of damages for a particular number of goods.

¶ 40. We consider first Judge Pekowsky's ruling. We do not agree with Thomasson Lumber that Judge Pekowsky found the City had engaged in egregious conduct in cutting up some of the poles. Thomasson Lumber's motion in limine did not argue that the City's conduct was egregious. Rather, it argued that the poles were in the City's control, and for that reason the City should be precluded from presenting evidence or argument on the poles that were cut up and from recovering damages for them.[10] As noted above, Judge Pekowsky accepted the City's explanation that it was necessary to cut up some poles to remove them, but concluded that, by not marking the poles, the City had not met its responsibility to preserve evidence. This ruling can be reasonably read only as a determination that the City was negligent in not marking the poles.[11]

---

[10] The factual materials Thomasson Lumber submitted in support of the motion were not directed at the City's conduct and motives; rather, they established that when its expert examined the poles the City made available, he observed poles that were cut up but did not include them in his inspection because he could not identify which poles they were from.

[11] In its ruling, the court relied on *Sentry Insurance Co. v. Royal Insurance Co.*, 196 Wis. 2d 907, 539 N.W.2d 911 (Ct. App. 1995), for the proposition that a party has a duty to preserve evidence essential to the claim litigated. Our decision in *Garfoot v. Fireman's Fund Insurance Co.*, 228 Wis. 2d 707, 599 N.W.2d 411 (Ct. App. 1999), was issued after the briefing on the motion

¶ 41. However, on the issue of whether Judge Pekowsky intended to preclude damages for the thirty-six poles as well as exclude evidence of them, we conclude his ruling is ambiguous. The ruling does not expressly refer to damages, stating only that the City could not introduce evidence regarding the cut-up poles. Although it is certainly reasonable to infer that if there is no evidence permitted on these poles, there can be no damages, his ruling did not state that, even though Thomasson Lumber specifically requested that relief.

¶ 42. We now turn to Judge Nicks's ruling. The parties debated in their trial and post-trial briefs whether Judge Pekowsky intended to preclude damages as well as evidence, but the City never raised the issue it now raises on appeal—that precluding damages for some poles was effectively a dismissal, which requires egregious conduct. Not surprisingly, therefore, Judge Nicks did not make a finding on whether the City had engaged in egregious conduct. Rather, she found that there was nothing in the trial record to call into question the finding Judge Pekowsky had made—that the City had not met its responsibility to preserve evidence.

¶ 43. With respect to the effect on damages of Judge Pekowsky's ruling, we are uncertain whether Judge Nicks construed his ruling to preclude an award of damages for the cut-up poles and decided that result remained fair; or whether she recognized his ruling did not address damages but concluded it was fair to preclude them for the cut-up poles. In either event, it is

in limine and shortly before Judge Pekowsky made his decision. From this timing and Judge Pekowsky's reliance on *Sentry* in his decision, it appears his decision was made without benefit of our decision in *Garfoot*.

evident that Judge Nicks precluded damages because of her judgment that it would unfair to allow them. We therefore conclude that we should review Judge Nicks's decision on this point as a discretionary decision made by her, rather than attempt to construe the ambiguous ruling of Judge Pekowsky.

¶ 44. Judge Nicks explained that as a result of the City's failure to mark the poles, Thomasson Lumber was deprived of its right to inspect all 225 poles, and her factual findings "[were] based on evidence derived from the inspection of available poles." She stated that it would be unfair to Thomasson Lumber to award damages to cover poles that were not available for inspection.

¶ 45. The difficulty we have with Judge Nicks's explanation is that the evidence she chose to rely on to establish that the poles were defective did not, as we explained above, depend upon on a visual inspection of each pole. Rather, Smith's testimony on the deficiencies in the treatment process was based on his expertise as applied to the results of Osmose's inspection of all the poles standing in 1994, the results of Nicholas's inspection of 188 poles in 1997 after they were removed, and his own random inspection of those same 188 poles. It is not apparent to us how the opportunity for Thomasson Lumber to inspect the additional thirty-six poles, with the knowledge of which pieces made up one pole, would have affected the trial court's findings. That is, even assuming that all thirty-six poles would not have shown signs of decay—and we recognize that there is evidence that some of the pieces did—we are uncertain that would have affected Smith's opinions or the trial court's decision to credit his opinions. We recognize that the trial court is in the best position to decide how an inspection of the thirty-six poles might have affected its

view of the evidence and its findings. We also agree that, in the absence of evidence to the contrary, it is fair to assume that those poles that were not inspected because the City did not mark them would have provided evidence favorable to Thomasson Lumber. Nonetheless, in spite of having carefully reviewed the record in light of Judge Nicks's expressed rationale, we are unable, without more explanation of her analysis, to conclude that her decision to preclude damages for the thirty-six poles is a proper exercise of discretion.

¶ 46. We are therefore persuaded that the best course is to reverse Judge Nicks's award of damages for only 189 poles and remand on this issue. This will provide the court with the opportunity to consider how Thomasson Lumber's lack of opportunity to inspect the thirty-six poles affected the court's findings of fact and to provide a fuller explanation of the conclusion it arrives at. Because we are remanding for this purpose, the City will have the opportunity to raise the issue of whether its conduct meets the standard established in *Garfoot*. We point out that under *Garfoot*, a finding of prejudice is not necessary in order to impose the sanction of dismissal—or, in this case, no damages—when the conduct is egregious; rather, that is a matter for the trial court to consider in the proper exercise of its discretion. 228 Wis. 2d at 730–31.

*By the Court.*—Judgment affirmed; cross-appeal reversed and cause remanded.