John R. Ammerman, Robert L. Klein and Brian G. Sumption, Plaintiffs,
Roi Investments, Plaintiff-Appellant,
v.
Paddy A. Hauden and Susan A. Scholl, Defendants-Respondents.
No. 03-2249.
Court of Appeals of Wisconsin.
Opinion Filed: July 29, 2004.
Before Deininger, P.J., Dykman and Vergeront, JJ.
¶1 VERGERONT, J.
ROI Investments appeals the circuit court's judgment of $303,523.15 on counterclaims related to a failed real estate transaction. ROI contends: the circuit court erroneously exercised its discretion in entering a default judgment against it; a counterclaim for civil conspiracy was neither properly pleaded nor proved; the evidence did not support the court's award of damages; and the court erred in awarding prejudgment interest under WIS. STAT. § 138.04 (2001-02).[1]
¶2 We conclude the circuit court properly exercised its discretion in entering a default judgment against ROI and the evidence supported the court's award of damages. For the reasons we explain in the opinion, it is unnecessary to address ROI's arguments concerning the civil conspiracy counterclaim. Finally, we agree with ROI that the circuit court erred in awarding prejudgment interest under WIS. STAT. § 138.04. We therefore affirm in part, reverse in part, and remand with directions consistent with this opinion.

BACKGROUND
¶3 The real estate that is the subject of this dispute is a commercial property located on Normandy Lane in Madison. In early 1995, it was owned by ROI, which at that time was a partnership comprised of two partners, John Ammerman and Robert Klein. The respondents, Paddy A. Hauden and Susan A. Scholl, made an offer to purchase the property for $1.6 million in March 1995. They had recently sold some farmland and were intent on purchasing an "exchange property" within six months in order to take advantage of a provision in the Internal Revenue Code that would allow them to avoid tax consequences from the sale of the farmland.[2]
¶4 The offer to purchase was accepted by ROI. It contained a leasing contingency. After unsuccessful attempts at negotiating a lease extension with the sole tenant of the property, the respondents proposed to amend the offer to purchase to reduce the purchase price to $1.3 million. ROI did not accept this offer.
¶5 The Normandy Lane property had been the subject of a pending foreclosure action. It was sold at a sheriff's sale on July 11, 1995, to Community National Bank of Oregon. The next day the respondents offered to purchase the property from the bank. On July 18, prior to the hearing on the confirmation of the sale, ROI filed a bankruptcy proceeding, which stayed the foreclosure action.
¶6 On July 25, 1995, the respondents submitted to ROI an offer to purchase the property for $1.3 million, contingent upon the bankruptcy court's approval and on closing before July 31. ROI accepted the offer. A hearing was scheduled for July 31 to obtain the bankruptcy court's approval. On July 31, RJK Partnership, comprised of Klein and his father, made an offer to purchase the property for $1.4 million. The bankruptcy court did not approve the respondents' offer. On August 4, RJK Partnership withdrew its offer.
¶7 Because the six-month deadline for the tax advantage was quickly approaching, the respondents did not make any further effort to acquire the Normandy Lane property, but instead purchased two duplexes in Sun Prairie. Several months later they sold these properties and purchased an office building on Science Drive in Madison.
¶8 ROI, Ammerman, Klein, and Brian Sumption, who had since become a partner of ROI, began this action in May 1999, alleging that the respondents had breached their contract with ROI by not purchasing the Normandy Lane property for $1.6 million. The respondents denied the allegations in the complaint, alleging that the leasing contingency had not been met. They also filed two counterclaims. One alleged that ROI and its partners had acted in concert with RJK Partnership to prevent the bankruptcy court's approval of the respondents' purchase of the Normandy Lane property (tort claim). The other alleged that by accepting the $1.3 million offer in July 1995, ROI Investments and its partners had a contractual relationship with the respondents that required them to act in good faith in performing the contract, and they breached that duty by acting in concert with RJK Partnership to prevent the respondents' purchase of the property for $1.3 million (contract claim). The respondents also sought punitive damages.
¶9 Eventually a trial was scheduled for January 23, 2002. Before the trial began, the court took up a motion filed by Klein for a delay in the trial. The court denied the motion and, because none of the plaintiffs were prepared to proceed on their claims against the respondents, the court dismissed the plaintiffs' claims with prejudice. With respect to the counterclaims, the court stayed them against Ammerman individually because he had recently filed bankruptcy, stayed them against Klein and Sumption individually, and granted a default judgment against ROI after concluding ROI was not present for trial.
¶10 The court subsequently held a trial on the damages to be awarded against ROI. In its written decision, the court rejected ROI's assertion that the counterclaim did not state a claim for a civil conspiracy between ROI and RJK Partnership to injure the respondents' business under WIS. STAT. § 134.01[3] and concluded that the evidence established a conspiracy to the requisite degree of proof. The court noted that because it found a civil conspiracy had been proved, it did not need to address alternative causes of action in the counterclaim.
¶11 With respect to damages, the respondents had proposed two alternative measures of damages at the trial: (1) the difference between the fair market value of the Normandy Lane property and the $1.3 million ROI had agreed to sell it for; and (2) "the benefit of the bargain" approach under which the respondents presented evidence of the costs and losses incurred as a result of the breach plus the difference between the reasonable performance expectation of the Normandy Lane property compared to the actual performance of the properties the respondents ultimately acquired. The court adopted the first approach, which it called the "loss of the bargain" approach, and found that the fair market value of the property was $1.5 million based on the value ROI Investments had stated in its bankruptcy schedules filed on August 3, 1995. Accordingly, the court found the damages under the "loss of the bargain" approach to be $200,000. The court also concluded that the respondents were entitled to prejudgment interest under WIS. STAT. § 138.04 because their damages were readily determinable. Although the court found that ROI's behavior in conjunction with RJK Partnership was "probably unethical" and "unprincipled and thoughtless," it found that the legal standard for punitive damages had not been met.
¶12 Subsequently, based on the respondents' offer of settlement under WIS. STAT. § 807.01 for $100,000, which had been rejected, the court ordered interest at a rate of 12% from February 17, 2002, plus double the taxable costs. The final judgment entered against ROI was for $303,523.15.

DISCUSSION

Default Judgment
¶13 WISCONSIN STAT. § 806.02(5) provides that a "default judgment may be rendered against any defendant who has appeared in the action but who fails to appear at trial." The decision whether to enter a default judgment is committed to the circuit court's discretion. See Palmerton v. Associates' Health & Welfare Plan, 2003 WI App 41, ¶9, 260 Wis. 2d 179, 659 N.W.2d 183. We affirm a discretionary decision if the circuit court considered the relevant facts of record, applied the correct legal standard, and reached a reasonable result. Id.
¶14 ROI contends the circuit court erroneously exercised its discretion in entering a default judgment against it because it did not fail to appear at trial on January 23, 2002. According to ROI, because two partners, Klein and Sumption, were present, ROI was present. Because ROI makes no other challenge to the entry of a default judgment, we limit our discussion to whether the circuit court had a reasonable basis in the record for concluding that ROI did not appear at trial. To that end, we set forth the procedural facts in some detail.
¶15 During the course of this proceeding in the circuit court, at least three different attorneys represented ROI and the three partners, and all were granted permission to withdrawat least two because they were not being paid.[4] Between the periods of representation by counsel, Ammerman appeared by telephone and corresponded with the court on behalf of ROI, including at the scheduling conference when the January 23, 2002 trial date was set. On December 21, 2001, the attorney then representing the plaintiffs, Gregory Fumelle, moved to withdraw for nonpayment of fees. The hearing on this motion was held on January 16, 2002, by which time the court had been notified that Ammerman had filed for bankruptcy on December 6, 2001. At the motion hearing, Ammerman appeared by telephone and objected to counsel's withdrawal,[5] Klein appeared in person and did not object, and counsel represented that Sumption did not object. The respondents did not object to Attorney Fumelle's withdrawal as long as the trial date of January 23, 2002, was not affected.
¶16 The court granted Attorney Fumelle's motion to withdraw. In doing so, the court emphasized that the trial was going to begin on January 23, 2002, as scheduled on the plaintiffs' claims; the court would address the effect of the bankruptcy on the counterclaims when that issue arose; and the court expected Ammerman to be present, either representing himself or with counsel. The court recounted the scheduling history and stated that Ammerman had manipulated the proceedings to seek delays to the prejudice of the respondents.
¶17 On January 18, 2002, Klein wrote to the court asking for a delay in the trial. Klein stated that he had not been able to obtain replacement counsel to represent ROI and that, with "the other partners of ROI in bankruptcy proceedings," the "entire case, which I did not personally initiate, has become my sole responsibility." One day before the scheduled trial, Klein, through counsel, filed a motion to stay the trial because of Ammerman's bankruptcy and also because Ammerman, who had entered into all the contracts and conducted all the negotiations, was now in Florida and could not be compelled to appear for trial. Accompanying the motion was Klein's affidavit explaining his efforts to obtain new counsel for the trial and stating that he had retained this counsel for the limited purpose of obtaining a stay based on the bankruptcy.
¶18 When court convened on January 23, 2002, Ammerman was not present and had not contacted the court. Klein was present, represented by the attorney who had filed the motion on his behalf, and Sumption was present. The court first took up Klein's motion for a stay. Klein's attorney emphasized that she was representing Klein for the sole purpose of requesting the stay. In addition to arguing that bankruptcy law required a stay, she also argued that Klein had no means to represent the plaintiffs on their claims or to defend the counterclaims brought against him as an individual if the trial were to go ahead, and no means to compel the attendance of Ammerman, who was the key witness for the plaintiffs' claims and defense to the counterclaims. Sumption spoke on his own behalf, stating he had only recently learned he was a party in this action and had nothing further to say.
¶19 The court denied Klein's motion. The court concluded that the automatic stay under 11 U.S.C. § 362 resulting from Ammerman's bankruptcy did not affect the plaintiffs' claims. It rejected the view that it was unfair to either Klein or Sumption to proceed on those claims, observing that they knew about the lawsuit[6] and had been content to allow Ammerman to take the lead; and, even though Ammerman was a 51% owner of the partnership, that did not absolve them from responsibility in the litigation. The court then recounted in detail the history of the proceedings, motions to withdraw by counsel, extensions of deadlines, and scheduling to accommodate the plaintiffs. Klein and Sumption stated that they were not prepared to proceed on their claims and the court therefore dismissed the claims of all plaintiffs with prejudice.
¶20 With respect to the counterclaims, the court agreed that the respondents could not proceed against Ammerman because of his bankruptcy. However, Klein's attorney argued that they could not proceed at all, because, if a judgment were entered against the partnership, the respondents might look to Ammerman's assets to satisfy it. The court, in response, pointed out that the partnership was not represented, that the attorney present was representing Klein, Sumption was representing himself, and no one was representing ROI. The attorney did not disagree, and neither did Klein or Sumption. The court stated that a default judgment against ROI was appropriate because ROI was not represented by anyone present and therefore was not prepared to proceed. Again no one spoke in disagreement. The court decided to give Sumption and Klein as individuals the opportunity to defend against the counterclaims.
¶21 Based on this record, we have no hesitation in deciding that the circuit court acted reasonably in concluding that ROI did not appear on January 23 for trial. We have already recounted two occasions on which the court, without correction, stated that ROI was not represented by anyone present. The court made the same statement two other times during the proceeding and was corrected neither time. In addition, when the court asked for appearances at the beginning of the hearing, neither Klein's counsel nor Klein nor Sumption stated that the appearance was on behalf of ROI. Finally, the argument made to the court on Ammerman's majority ownershipthat as majority owner, he controlled the litigation and it was unfair to hold Klein and Sumption responsibleruns directly counter to ROI's position that Klein and Sumption were appearing on behalf of ROI. In short, the court made it very clear that in its view ROI was not represented by anyone present and gave Klein, his attorney, and Sumption ample opportunity to correct that view, but no one did. We conclude that the court properly exercised its discretion in entering a default judgment on the counterclaims against ROI on the ground that ROI did not appear at trial.

Civil Conspiracy Claim
¶22 ROI contends the circuit court erred in construing the tort counterclaim to allege a civil conspiracy and in finding that the evidence established a civil conspiracy. However, ROI does not explain, and we do not see, how either of these issues matters given that the court had entered a default judgment on the entire counterclaim, which also contained a contract claim.
¶23 We understand that the circuit court addressed the tort claim because of the request for punitive damages, and a decision on punitive damages required that the court make findings as to exactly what the plaintiffs did and did not do, even though liability had been established by virtue of the entry of the default judgment. However, the court did not award punitive damages, and the damages it did award, according to both parties' briefs here and in the circuit court, were based on theories of damages for breach of contract. ROI argued in the circuit court that the only damages the respondents could recover, based on the entry of the default judgment, were for the contract claim. The circuit court said nothing in its decision to suggest that liability on the contract claim had not been established by the entry of the default judgment; it simply stated that it had no need to address that claim because it had already found damages under the "loss of bargain" theory for a civil conspiracy.
¶24 We have affirmed the entry of the default judgment. There is no argument before us from either party that the measure of compensatory damages would differ in any way depending on whether liability flowed from the contract claim or from a civil conspiracy claim. Accordingly, we conclude it is unnecessary to discuss ROI's arguments on the civil conspiracy claim.

Damages
¶25 ROI contends the record does not support the court's determination that the fair market value of the property was $1.5 million. ROI argues that under bankruptcy law the values stated on a bankruptcy schedule are not conclusive as to fair market value. Citing Hansen v. Hansen, 95 B.R. 586 (Bankr. C.D. Ill. 1989) and Federal Rule of Bankruptcy Procedure 3012, ROI argues that any party in interest may bring a motion to determine the value of an asset of the bankruptcy estate and, if a party does, the bankruptcy court then considers the evidence presented and decides on a value.
¶26 ROI's challenge to the damage award is based on the court's determination of fair market value. That is a question of fact, and we do not set aside a circuit court's factual finding unless it is clearly erroneous. Rumage v. Gullberg, 2000 WI 53, ¶43, 235 Wis. 2d 279, 611 N.W.2d 458. When viewing the evidence to determine if it supports a damage award, we view the evidence in the light most favorable to the award, Teff v. Unity Health Plans Ins. Corp., 2003 WI App 115, ¶41, 265 Wis. 2d 703, 666 N.W.2d 38, and if there are competing reasonable inferences to be drawn from the evidence, we accept those that support the findings made by the court. Rumage, 235 Wis. 2d 279, ¶43.
¶27 Applying this standard, we conclude the circuit court's finding that the fair market value of the property was $1.5 million was not clearly erroneous. The schedules were submitted under penalty of perjury and it is a reasonable inference that ROI as the owner of the property knows its fair market value. The fact that the value on the schedule is not conclusive as to fair market value in a bankruptcy proceeding if other evidence is presented that the bankruptcy court finds more persuasive does not mean that the court in this case cannot decide the schedule does accurately state the fair market value. ROI did not present evidence that its sworn value was not an accurate reflection of the fair market value. ROI points to evidence that may support a lower fair market value than $1.5 million, but that is not the proper inquiry. Our task is not to examine the record to see if the court could have made another finding of fair market value, but instead to determine whether there is evidence to support the finding the court did make. See City of Stoughton v. Thomasson Lumber Co., 2004 WI App 6, ¶28, 269 Wis. 2d 339, 675 N.W.2d 487. We are satisfied that there was.[7]

Prejudgment Interest
¶28 ROI contends the circuit court erred in awarding prejudgment interest under WIS. STAT. § 138.04 because the compensatory damages the respondents sought were not liquidated or liquidable.[8]
¶29 The circuit court and respondents are of the view that the damages here were readily determinable, that is, liquidable, because respondents were relying on the fair market value as stated in ROI's own bankruptcy schedules.
¶30 A party's entitlement to prejudgment interest is a question of law, which we review de novo. Teff, 265 Wis. 2d 703, ¶42.
¶31 The general rule is that prejudgment interest may be recovered only when damages are either liquidated or liquidable, meaning that there is a reasonably certain standard by the correct application of which one can be certain of the amount he or she owes. Id., ¶43. The most frequently stated rationale for the rule is that if the amount of damages is either liquidated or determinable by reference to some objective standard, the party proceeded against can avoid the accrual of interest by simply tendering money to the claimant in a sum equal to the amount of damages. Id. Examples of cases in which prejudgment interest is not appropriate include those with factual disputes that need to be resolved to decide the proper method of calculating damages under a contract, id., ¶47 (discussing Jones v. Jenkins, 88 Wis. 2d 712, 726, 277 N.W.2d 815 (1979)), and those with factual disputes that need to be resolved to determine lost revenues because of a breach of contract. Id., ¶49-50.
¶32 We conclude the damages from ROI's conduct that thwarted the sale to respondents for $1.3 million were not liquidated or liquidable. The respondents presented two different measures of damages, both of which required the resolution of factual disputes. We do not agree with the circuit court or respondents that the measure the court chose did not involve the resolution of factual disputes because the fair market value the court arrived at was contained in ROI's bankruptcy schedules. Before the trial, the court rejected the respondents' motion to judicially estop ROI from contesting a fair market value of $1.5 million because it was contained in the bankruptcy schedule; the court stated that it would nonetheless consider that value as evidence of fair market value along with any other evidence produced at trial. The court did that, and, as we have explained above, it did not err in finding that was the fair market value. However, there was other evidence from which the court could have reasonably inferred a lower fair market valuefor example, the purchase price of $1.3 million offered by the respondents and conditionally accepted by ROI, the same offer the respondents had made a couple of months earlier before ROI filed for bankruptcy. Moreover, by offering an alternative measure of damages, the respondents themselves acknowledged that there was more than one appropriate measure, and the measure the court did not adopt required the resolution of factual disputes over what expenses and losses had been caused by respondents' inability to acquire the Normandy Lane property. This is not a situation where the contract established a method by which one could determine the amount owed with reference to undisputed facts. See, e.g., Id., ¶46 (prejudgment interest appropriate because contract plainly set forth method by which to determine amount of payments and no factual disputes needed resolution to apply that method).[9]
¶33 The respondents make a brief reference to Lommen v. Danaher, 165 Wis. 15, 161 N.W.2d 14 (1917), apparently as an alternative basis for awarding prejudgment interest. In that case, the seller under a land contract did not complete his obligations and so returned the personal and real property that had been the consideration for the purchase. Id. at 16-17. The purchaser sued, claiming that he was entitled in addition to the difference in the value of that consideration and the fair market value of the property he had attempted to purchase, plus interest since the breach. Id. at 17. The issue on appeal was whether the seller was entitled to more than the return of the consideration, and the court concluded he was. The court stated the proper measure of the damages was the difference between the fair market value of the property to be sold and the value of the consideration, plus interest from the time of the breach. Id. at 23. It is this reference to interest on which the respondents rely. There is no other discussion of entitlement to interest in the case. Moreover, the respondents do not relate Lommen to the case law that has more recently developed concerning the award of prejudgment interest. Their argument based on Lommen is not developed sufficiently for us to conclude that it is an alternative basis on which to award prejudgment interest if damages are not liquid or liquidable.
¶34 We conclude the circuit court erred in awarding prejudgment interest at 5% from July 31, 1995.

CONCLUSION
¶35 We affirm the circuit court's entry of a default judgment against ROI and its award of damages against ROI in the amount of $200,000. However we conclude the circuit court erred in awarding prejudgment interest at 5% from July 31, 1995. Accordingly, we reverse this aspect of the judgment and remand with instructions to modify the judgment to delete the amount of the prejudgment interest awarded at 5% from July 31, 1995.
By the Court.  Judgment affirmed in part; reversed in part and cause remanded with directions.
NOTES
[1] All references to the Wisconsin Statutes are to the 2001-02 version unless otherwise noted.
[2] Under 26 U.S.C. § 1031 (2002), a party who sells a real estate asset may avoid realizing a capital gain on the sale by acquiring a like-kind business or investment "exchange" property within six months.
[3] WIS. STAT. § 134.01 states:

Injury to business; restraint of will. Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his or her reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his or her will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.
[4] The circuit court stated that there were four attorneys, but it is not clear from the record whether Attorneys Hanson and Manzo were from the same firm.
[5] The court informed Ammerman that it had not given him permission to appear by phone and he could not appear by phone at trial without the court's permission.
[6] The court stated that the file showed that in May 2001 notices were sent to Sumption at the address provided and came back indicating no forwarding address. Sumption had not since notified the court of an address, so no further notices were sent.
[7] In its reply brief, ROI contends that, because the respondents purchased other property from which they realized income, they were not damaged by the inability to acquire the Normandy Lane property and, in fact, were better off. In its main brief, ROI argues only that the record does not support the court's finding of a fair market value of $1.5 million for the Normandy Lane property. ROI appears to argue in its reply brief that the measure of damages the court employed was in error because the court did not consider the financial benefits the respondents realized from the property they purchased instead of the Normandy Lane property. We do not consider arguments made for the first time in the reply brief. Henry v. General Cas. Co., 225 Wis. 2d 849, 868 n.10, 593 N.W.2d 913 (Ct. App. 1999). We also observe that in the circuit court ROI did not challenge as legal error the measure of damages the court ultimately adopted, but asserted only that the evidence did not show any difference in the agreed upon purchase price and the fair market value. We generally do not address arguments not made in the circuit court, Johnson v. Johnson, 199 Wis. 2d 367, 374, 545 N.W.2d 239 (Ct. App. 1996), and we decline to do so here.
[8] WISCONSIN STAT. § 138.04 provides:

Legal rate. The rate of interest upon the loan or forbearance of any money, goods or things in action shall be $5 upon the $100 for one year and according to that rate for a greater or less sum or for a longer or a shorter time; but parties may contract for the payment and receipt of a rate of interest not exceeding the rate allowed in ss. 138.041 to 138.056, 138.09 to 138.12, 218.0101 to 218.0163, or 422.201, in which case such rate shall be clearly expressed in writing.
This statute establishes a rate of interest, but it is the case law we discuss above that controls whether the court properly awarded prejudgment interest in this case.
ROI does not contest the interest at 12% awarded from the date of the respondents' settlement offer under WIS. STAT. § 807.01.
[9] Our analysis and conclusion on prejudgment interest is the same whether we treat the damages awarded as those caused by the civil conspiracy the court found was properly pleaded and proved or those caused by the contract claim alleged.