NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos.  18-3795 and 18-3827
_____

WASHINGTON UNIVERSITY,
                                        Appellant in No. 18-3827

v.

WISCONSIN ALUMNI RESEARCH FOUNDATION,
                                        Appellant in No. 18-3795


_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 1-13-cv-02091)
District Judge: Honorable Joseph F. Bataillon
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1
on April 15, 2020

Before: CHAGARES, SCIRICA, and ROTH, *Circuit Judges*

(Filed: October 28, 2020)
_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

**SCIRICA**, Circuit Judge

Defendant Wisconsin Alumni Research Foundation ("WARF") asks this Court to overturn the trial court's finding that it could not assert the statute of limitations as a defense in a breach-of-contract dispute with Plaintiff Washington University. The trial court determined that the statute-of-limitations defense was unavailable to WARF because it had concealed its practice of diluting royalty payments for a patent that it jointly owned with Washington University, withholding millions of dollars. In a bench trial, the trial court found WARF breached the contract and awarded damages to Washington University. But it concluded that the amount was not sufficiently certain to justify an award of prejudgment interest. In a cross-appeal, the University asks for prejudgment interest on the damages it received.

We will affirm in part and reverse in part. We hold that the trial court correctly determined that WARF could not raise the statute of limitations as a defense, but hold that the University is entitled to prejudgment interest and will reverse and remand for further proceedings on that issue.

## I.

### A.

In 1995, WARF and Washington University entered into the Inter-Institutional Agreement for Prevention of Hyperphosphatemia in Kidney Disorder Patients (the "IIA"). Among other things, the IIA, which is governed by Wisconsin law, sets the terms for how WARF and the University would share royalties for a jointly owned and invented

2

method of treatment for chronic kidney disease. This method of treatment would eventually receive patent protection as U.S. Patent No. 5,597,815 ("the '815 patent").

Under the IIA, WARF assumed the role of the "senior party" in matters concerning the '815 patent, while the University was the "junior party." As the senior party, WARF was granted by the University the "exclusive right" to (1) "prepare, file, prosecute, and maintain" the rights arising from the '815 patent; (2) "negotiate, execute, administer, and enforce" any license agreements to the '815 patent; and (3) "determine whether or not [WARF or the University] shall engage in and prosecute any legal actions" involving the '815 patent. In this role, WARF assumed the duty to keep the junior party informed of key events and decisions relating to the parties' jointly owned intellectual property.

As the junior party, Washington University retained its ownership interest in the '815 patent but gave up its rights to commercialize, license, or enforce the patent. In exchange for "securing and administering" any license agreements relating to the parties' joint invention, WARF received an administration fee equaling 15% of royalties on the '815 patent. Once these administrative fees and certain patent prosecution fees were deducted from total revenues, WARF agreed to pay the University one-third of the revenues from licensing the '815 patent, with WARF keeping the remaining two-thirds.

The IIA also set the terms for the treatment of royalties when a patent is included in a portfolio of other patents. In the event the '815 patent was licensed as part of a portfolio, the parties agreed that "WARF shall have the authority to assign relative

3

values" to the '815 patent. "Relative value" was not defined by the IIA, but the trial court found, and neither party contests on appeal, that when the '815 patent is included in a portfolio of other patents, this clause requires WARF to assign to the '815 patent "the monetary or material worth, in light of all circumstances relevant to such license, considered in relation to the value of the other patents licensed in the portfolio." This is a "*patent-specific* relative value." Under the construction given to the IIA by the trial court, "WARF cannot assign a random value to the '815 patent," and if some patents in a portfolio contribute "no value to the license," then those patents would be "assigned a low (or zero) 'relative value' accordingly."

In 1998, WARF entered into a license agreement with Abbott Laboratories that added the '815 patent to a licensed portfolio of patents and patent applications. This portfolio protected a drug, paricalcitol, that was approved by the Food and Drug Administration to be sold commercially by Abbott under the brand name Zemplar. Significantly, WARF recognized that the '815 patent "directly support[ed]" Zemplar. Zemplar would go on to be wildly successful, generating approximately $6.1 billion in total sales revenues for Abbott. WARF would ultimately receive approximately $426.5 million in royalties from Zemplar.

For purposes of royalty payments under the IIA, WARF assigned relative values to the patents in the 1998 License portfolio. In its initial allocation, WARF divided 70% of the overall value of the portfolio between two "Licensed Patents." The remaining 30% was divided among thirty-one "Ancillary Patents," each of which was given an equal

4

relative value of 0.968%. The '815 patent was included in the group of Ancillary Patents, and WARF accordingly gave it a relative value of 0.968% of the total portfolio, the same as the thirty other patents in the group. With the exception of the '815 patent, all of these patents were owned solely by WARF.

WARF made its first distribution of Zemplar royalties to Washington University later in 1998. Although WARF would receive approximately $426.5 million in royalties in the coming years, it would only remit a little over $1 million to Washington University, the co-owner of the '815 patent. This was later found by the trial court to be inadequate. In the trial court's estimation, "there was no economic justification for WARF to have assigned such a low relative value to the '815 patent." "Nor was there any economic justification for WARF to have assigned the exact same relative value to each of the other so-called 'Ancillary Patents.'" As was eventually revealed, most of the other Ancillary Patents had "little to no relationship to Zemplar," with the result that WARF's placement of the '815 patent in the group of Ancillary Patents was "arbitrary and self-dealing" and served primarily to dilute the value of the '815 patent, to the detriment of Washington University. This remained the case even after WARF re-allocated relative values in 1999, when WARF reduced the number of Ancillary Patents to thirty from thirty-one and gave each patent a relative valuation of 1% of the total portfolio—all except the '815 patent, which continued to receive a valuation of 0.968% for the next sixteen years.

**B.**

WARF's appeal primarily revolves around the question of when Washington University learned of this dilutionary practice. In May 1998, shortly after the launch of Zemplar, Washington University asked WARF whether there was an "actual license agreement" or one that "has the potential of being executed in the near future" between WARF and Abbott, and if so, whether the University could see it. WARF confirmed the existence of a license agreement, but represented that because of certain "confidentiality provisions," it was "not at liberty to provide [the University] copies of [WARF's] license agreements with any other parties." Although the University did not know it at the time, this was false—the trial court later found that the "confidentiality provisions" cited by WARF "did not exist." In fact, WARF was then in the process of entering into the 1998 License with Abbott, but did not share that information with the University.

On April 4, 2001, in response to a request by Washington University, WARF provided a few more details in a valuation letter about how it calculated the royalties it had assigned to the '815 patent. Though it did not identify any of the other patents in the portfolio, WARF explained that it had assigned a value of 70% to the two Licensed Patents in accordance with its "regular practice." WARF also told the University that there were thirty-one other patents in its portfolio under the 1998 License, which included the '815 patent. As one of the Ancillary Patents, the '815 patent was allocated an "equal share of the remaining thirty percent (30%) of the royalties generated by the License Agreement," which under the IIA entitled the University to "one third of .968 percent of

6

the total royalties generated under the [1998] license agreement" each year. WARF further represented that "it is WARF's policy to allocate evenly among these patents regardless of whether or not the patent is actually currently being used by the Licensee" because, "in many cases, it is difficult if not impossible for WARF to determine whether or not the patent is being used by the Licensee at this time."

As the trial court later found, WARF's 2001 valuation letter "was full of misstatements, half-truths, and misdirection." For example, several of the "policies" cited by WARF were not actually policies at all, and though WARF averred it was "difficult if not impossible" to determine whether a patent was currently in use, WARF had by this time concluded, but had not told Washington University, that the '815 patent "directly support[ed]" Zemplar. In other words, WARF knew what Washington University did not know—that the '815 patent provided protection to a billion-dollar pharmaceutical. Indeed, during this time Abbott was paying WARF 7% of earned royalties on the '815 patent because of the protection it provided to Zemplar. This was not the only material information omitted. WARF similarly knew that eight of the Ancillary Patents would expire within the first four years of the 1998 License Agreement, but gave them the same relative value anyway.

Washington University did not respond to WARF's valuation letter and did not seek additional information until many years later. The University would not obtain a copy of the 1998 License or have access to the calculation of relative values until discovery in the case at bar.

## C.

Litigation eventually unfolded. Starting in 2012, and unbeknownst to Washington University, WARF and Abbott Laboratories began asserting the '815 patent in litigation against certain drug manufacturers. In three of these cases, the '815 patent was the *only* patent asserted to maintain Zemplar's market exclusivity, while many of the other Ancillary Patents had never been asserted to protect Zemplar. After receiving a third-party subpoena from a defendant in one of these matters, Washington University learned about WARF's assertion of the '815 patent in litigation and began to investigate. Soon after, WARF and the University entered into a standstill agreement tolling the statute of limitations for any claims relating to the IIA, effective as of April 9, 2013.

Washington University filed this action on December 26, 2013, alleging breach of contract and related claims. The University alleged that WARF had "breached the IIA through its failure to assign a proper value to the '815 Patent relative to the other intellectual property in the [1998 License], its underpayments to Washington University under the IIA, its failure to cooperate with Washington University with respect to licensing of the '815 Patent," and through other conduct. WARF moved for summary judgment, contending that even if it breached the IIA in 1998 by assigning a low relative value to the '815 patent, the University's claims were time barred under Wisconsin's six-year statute of limitations for contract actions. *See* Wis. Stat. § 893.43. Washington University argued WARF was equitably estopped from raising this defense because the University had reasonably relied on WARF's concealment of its dilution to its detriment,

8

but the trial court rejected this argument and granted summary judgment in favor of WARF. *See Wash. Univ. v. Wis. Alumni Research Found.*, No. CV. 13-2091 (GMS), 2016 WL 310722, at *7–10 (D. Del. Jan. 25, 2016).

This Court reversed. *See Wash. Univ. v. Wis. Alumni Research Found.*, 703 F. App'x 106 (3d Cir. 2017). On the issue of equitable estoppel, we found "there [was] clearly a genuine dispute of fact regarding whether Washington University knew that WARF's statements regarding confidentiality and assignment of value were inaccurate," and concluded that the trial court erred when it held that equitable estoppel was inapplicable as a matter of law. *Id.* at 110. We also remanded for further proceedings on the applicability of Wisconsin's "continuing violation" exception to the statute of limitations. *Id.* at 109; *see, e.g.*, *Noonan v. Nw. Mut. Life Ins. Co.*, 687 N.W.2d 254, 262 (Wis. Ct. App. 2004).

After holding a bench trial on remand, the trial court found WARF liable for breach of contract because, among other things, WARF had failed to provide a "patent-specific relative value" of the '815 patent, which was "one of the most important patents in the 1998 Abbott License." Instead of the 0.968% relative value given by WARF, the trial court found, relying on expert testimony, that the '815 patent should have received a much higher relative value of 27.1%. The trial court also found that WARF was equitably estopped from asserting a statute of limitations defense, finding "clear and convincing" evidence that WARF had concealed the information that Washington University needed for determining it had a claim and that the University had reasonably relied on WARF's

9

representations to its detriment. In the alternative, the trial court also found that because the IIA imposed an annual "duty to revalue" the '815 patent, the "continuing violation" exception to Wisconsin's statute of limitations applied.

The trial court then calculated the damages to be awarded to Washington University. Because the assigned relative value was so low—0.968% of the total portfolio's value instead of 27.1%—the trial court awarded $31,617,498 in compensatory damages to the University. But the trial court denied prejudgment interest on this sum. The court recognized that the University's damages were determinable "by reference to some objective standard," as they must be for prejudgment interest to be awardable under the applicable Wisconsin law. Even so, since there was a "reasonable range of patent-specific relative values between 27.1% and 33%," the trial court held that "it cannot be said that this reasonable standard of measurement or the correct application of which one was sufficiently certain to ascertain the amount owed before this lengthy opinion."

## II.[1]

Two sets of issues are before us. WARF argues that Wisconsin's six-year statute of limitations barred Washington University from bringing suit in December 2013. *See* Wis. Stat. § 893.43. As a preliminary matter we note two points of agreement. First, neither party disputes that Washington University filed well past this deadline. *See CLL*

---

[1]    The District Court had jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), and we have jurisdiction pursuant to 28 U.S.C. § 1291.

*Assocs. Ltd. P'ship v. Arrowhead Pac. Corp.*, 497 N.W.2d 115, 117 (Wis. 1993) ("[I]n an action for breach of contract, the cause of action accrues and the statute of limitations begins to run from the moment the breach occurs. This is true whether or not the facts of the breach are known by the party having the right to the action." (citations omitted)). Second, neither party contests that WARF breached the IIA by assigning a low relative value to the '815 patent. Therefore, WARF's challenges are limited to whether the trial court (1) correctly determined that WARF is equitably estopped from asserting the statute of limitations through its conduct or, in the alternative, (2) properly construed the IIA and, in consequence, correctly applied Wisconsin's "continuing violation" exception to the statute of limitations.

In its cross-appeal, Washington University seeks review of the trial court's conclusion that WARF did not have to pay prejudgment interest on $31,617,498 in compensatory damages because, in the trial court's view, there was not a "reasonable standard of measurement" that would make damages "sufficiently certain to ascertain the amount owed" until the court issued its "lengthy opinion."

## A.

Our analysis begins with WARF's challenge to the trial court's equitable estoppel findings. Equitable estoppel is a legal question with underlying factual questions. *See May v. May*, 813 N.W.2d 179, 183–84 (Wis. 2012) ("The determination of whether equitable estoppel may be applied to an uncontested set of facts is a question of law that we review independently of the previous court decision."). We review a district court's

findings of fact for clear error and its conclusions of law *de novo*. *See VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282–83 (3d Cir. 2014).

Equitable estoppel prevents a defendant from asserting the statute of limitations when it "has engaged in fraudulent or wrongful conduct, and the other side has relied on the conduct to its detriment." *Policemen's Annuity & Ben. Fund, Milwaukee v. Milwaukee*, 630 N.W.2d 236, 243–44 (Wis. Ct. App. 2001). The doctrine applies when there is "(1) action or non-action; (2) on the part of one against whom estoppel is asserted; (3) which induces reasonable reliance thereon by the other, either in action or non-action; (4) which is to the relying party's detriment." *Wash. Univ.*, 703 F. App'x at 109 (quoting *Affordable Erecting, Inc. v. Neosho Trompler, Inc.*, 715 N.W.2d 620, 628 (Wis. 2006)). We have already held that the doctrine is applicable in these circumstances as a matter of law, and directed the trial court to resolve four genuine issues of material fact:

> (1) whether WARF concealed information Washington University needed to determine if it had a valid claim;
> (2) whether that information was necessary to pursue the claim;
> (3) whether Washington University reasonably relied on WARF's statements and conduct; and
> (4) whether Washington University had the ability to obtain that information, notwithstanding WARF's alleged concealment.

*Id*. at 110.

On remand, the trial court resolved each question in favor of the University. It found there was "extensive" evidence that WARF had "actively concealed, and refused to share, the very information that WashU needed to determine that it had a valid claim for

12

breach of contract" arising from the relative value given to the '815 patent. It consequently held that WARF was equitably estopped from asserting a statute-of-limitations defense.

We find no clear error. Despite its obligation to act in the parties' mutual benefit as the "senior party" under the IIA, WARF invoked "confidentiality provisions" that simply "did not exist," concealed critical information about the '815 patent, obscured the nature of the patents in the 1998 License portfolio, and did not disclose WARF's internal valuation methodologies. Perhaps most pertinently, the trial court found that "WARF assigned equal value to numerous patents that had *nothing to do* with paricalcitol and hid this from WashU for as long as possible," a practice that "systematically diluted the relative value of the '815 patent."

WARF does not seriously challenge any of these factual findings. Instead, it presents a series of arguments to the effect that Washington University should have known about WARF's dilution of royalties for the '815 patent in spite of WARF's actions. None is persuasive. Although WARF contends that "all the information WashU ever would have needed [about breach of the IIA] was supplied within the 'four corners' of the IIA and available to WashU all along," this is not enough for the University to know of WARF's breach. Knowledge that a party has agreed to perform is not the same as knowledge of actual performance, and the University had no access to the details of WARF's *performance* until it learned about the value of the other patents in the portfolio years later.

13

We also reject WARF's contention that the University should have known about its dilutionary practices when it told the University in its 2001 valuation letter that it had given each of the Ancillary Patents, including the '815 patent, an "equal share" of the portfolio's value. WARF did not breach the IIA simply by giving an "equal share" to the '815 patent; it breached the IIA by "systematically dilut[ing]" the '815 patent through a convoluted scheme and then hid that scheme from Washington University "for as long as possible." The issue here is not that the '815 patent received a mathematically "equal" value, but that it received an *inadequate* value far beneath its "relative" value.

In its final factual challenge, WARF argues that it told the University about its valuation practices in its 2001 valuation letter. Yet the trial court determined that this letter was false and deceptive because it "created the false impression that WARF was unable to determine whether any of the Ancillary Patents, including the '815 patent, supported the development and commercialization of paricalcitol/Zemplar." By this time, WARF had already determined, but had not told the University, that the '815 patent "directly support[ed] Zemplar," and also knew that eight of the patents in the ancillary portfolio were slated to soon expire but gave them the same valuation anyway. We hold that the record amply supports the trial court's findings.

We turn now to WARF's legal challenges to the trial court's equitable estoppel holding. In its first argument, WARF contends that the trial court applied the wrong legal standard for equitable estoppel because it failed to consider whether WARF's conduct

caused the University to file suit many years after WARF's breach in 1998.[2] Distilled to its essence, WARF's argument is that even though the trial court found that Washington University "relied" on WARF's conduct and misstatements, those conduct and misstatements did not "cause" the University to file until after the statute of limitations had lapsed. Because the trial court did not break out causation from the reliance inquiry, WARF argues, its holding was error.

We fail to see the distinction, at least in these circumstances. If the University's "reliance" on WARF's statements and conduct did not cause it to fail to file within the statutory period, then it can hardly be said to have *relied* on those statements and conduct to its detriment. Causation is implicit in the element of "reliance"; the terms are often used interchangeably under Wisconsin law, as well as the law of other jurisdictions. *See, e.g.*, *Ramsden v. Farm Credit Servs. of N. Cent. Wisconsin ACA*, 590 N.W.2d 1, 8 (Wis. Ct. App. 1998) ("Reliance, in a negligent misrepresentation claim, is equivalent to the causation element . . . ."); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011) (noting that within the context of a Rule 10b-5 action for securities fraud, "the element of reliance" is often referred to as "transaction causation"); *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1546 (7th Cir. 1990)

---

[2]   To the extent that WARF challenges the trial court's factual findings on reliance through this line of argument, there was substantial evidence to support the trial court's findings. The trial court found that "[a]bsent critical information from the 1998 License, namely that the '815 patent was exclusively licensed . . . and that the '815 patent was included in a group of 'Ancillary Patents,' . . . WashU lacked the ability to determine for itself whether it had a valid claim against WARF for breach of contract."

15

("[R]eliance means only the conjunction of materiality and causation . . . ."). Tellingly, WARF's arguments at the trial court reveal the same reality: to the extent that WARF even argued that causation was a separate element, that argument was indistinguishable from WARF's arguments about detrimental reliance.

So the fact that the trial court did not make a separate finding on causation is unremarkable here. When the trial court concluded that "WashU reasonably relied on WARF's statements and conduct," that conclusion could only be read to contemplate a material degree of causation. That the trial court did not explicitly say as much is beside the point. A court's findings are adequate if "they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision." *Zimmerman v. Montour R.R. Co.*, 296 F.2d 97, 98 (3d Cir. 1961); *see also VICI Racing*, 763 F.3d at 297–98 ("A trial court's findings are sufficient if the affirmative facts found by it, construed as a whole, negate a rejected contention."); *State v. Fishnick*, 378 N.W.2d 272, 281 (Wis. 1985) ("[T]his court will not reverse a trial court's ruling if the ruling is correct and the record reveals a factual underpinning that would support the proper findings."). We accordingly reject WARF's argument that the trial court applied the wrong standard.[3]

In its second legal challenge to the trial court's equitable estoppel holding, WARF argues that the trial court wrongly imposed a duty on WARF to tell Washington

---

[3] As for WARF's contention that equitable estoppel requires not just a finding of causation but rather a finding of *but for* causation, we will not address that question because WARF did not raise it below. *See Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 249 (3d Cir. 2013) ("We generally refuse to consider issues that the parties have not raised below.").

University about its breach. As WARF notes, a defendant may be subject to equitable estoppel if it "took active steps to prevent the plaintiff from suing," such as by "concealing evidence . . . that [the plaintiff] needed in order to determine that he had a claim." *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 689 (7th Cir. 2004) (cleaned up). Applying the inverse of this proposition, WARF contends that because, in its view, the trial court found that it did not take "active steps" to deceive the University, it cannot be equitably estopped from asserting a statute-of-limitations defense.

But this argument fails too. First, the trial court actually *did* find that WARF "actively concealed, and refused to share" necessary information. But even without that finding, WARF had a duty under the IIA "to communicate, in a timely manner, all material information concerning the ['815 patent] that is available to WARF and that is relevant to the licensing thereof." Therefore we reject this contention as well, and will affirm the trial court's holding on equitable estoppel. Because we affirm on these grounds, we need not consider the trial court's alternative holding on the applicability of the "continuing violation" exception to Wisconsin's statute of limitations.

**B.**

We now consider Washington University's cross-appeal for prejudgment interest. The University asks this Court to increase its judgment by 5% in prejudgment interest through the entry of judgment on November 26, 2018. *See* Wis. Stat. § 138.04.

17

Entitlement to prejudgment interest is a question of law that we review *de novo*. *See Beacon Bowl, Inc. v. Wis. Elec. Power Co.*, 501 N.W.2d 788, 802 (Wis. 1993).

Under Wisconsin law, "he who retains money which he ought to pay to another should be charged interest upon it." *Laycock v. Parker*, 79 N.W. 327, 335 (Wis. 1899). Courts may award prejudgment interest to compensate a plaintiff for "the value of the use of the money—a value which should be accruing for the benefit of the plaintiff-creditor" but "was accruing to the defendant-debtor instead." *Johnson v. Pearson Agri-Sys., Inc.*, 350 N.W.2d 127, 131 (Wis. 1984). Prejudgment interest may be awarded if "there is a reasonably certain standard of measurement by the correct application of which one can ascertain the amount he or she owes," *Teff v. Unity Health Plans Ins. Corp.*, 666 N.W.2d 38, 53 (Wis. Ct. App. 2003), and damages are ascertainable when a defendant "could have determined at least the upper limit of its liability with reasonable certainty." *Fattore Co. v. Metropolitan Sewerage Comm'n of Milwaukee Cty.*, 505 F.2d 1, 7 (7th Cir. 1974) (applying Wisconsin law); *see also* 24 Williston on Contracts § 64:12 (4th ed. 2019) (noting that damages may be ascertained "if a reasonable basis for computation of damages is afforded, even though the result will only be approximate").

Although the trial court admirably handled the complex web of issues before it, we believe it erred by denying prejudgment interest to Washington University. If WARF does not have to pay prejudgment interest here, then it would be the beneficiary of a $31,617,498 interest-free loan, denying the University the time value of its wrongfully withheld royalty payments. *Cf. Johnson*, 350 N.W.2d at 131. Nothing in Wisconsin law

18

supports such an entitlement. Far from finding this valuation incalculable, WARF itself assigned a relative value to the '815 patent of 0.968% which—though leagues away from the 27.1% later determined to be accurate by the trial court—indicates that WARF was capable, in theory if not in practice, of applying some objective measurement to the relative value of the '815 patent.

The parties' now-longstanding dispute about liability in this matter does not alter the outcome here. Even if the '815 patent was "grossly undervalued" and became the subject of contentious debate, that disagreement does not furnish a basis to deny prejudgment interest. "Mere difference of opinion as to amount is . . . no more a reason to excuse [a party] from interest than difference of opinion whether he legally ought to pay at all, which has never been held [to be] an excuse." *Giffen v. Tigerton Lumber Co.*, 132 N.W.2d 572, 575 (Wis. 1965) (quoting *Laycock*, 79 N.W. at 335). Although the trial court heard varying testimony on a range of relative values that should have been allocated to the '815 patent, we do not find this range to be uncertain enough to deny the award of prejudgment interest. "Where the amount owed is readily ascertainable and not paid, the withholding party should be held responsible for making such determination correctly and liable for interest." *Klug & Smith Co. v. Sommer*, 265 N.W.2d 269, 272 (Wis. 1978). As such, we find that Washington University is entitled to prejudgment interest. We will accordingly vacate the trial court's order on that limited issue and remand for further proceedings consistent with this opinion.

**III.**

For the reasons set forth above, we will affirm in part and reverse in part the judgment of the trial court.